## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ADIRONDACK TRANSIT LINES, INC.,
PINE HILL-KINGSTON BUS CORP., and
PASSENGER BUS CORPORATION,
    499 Hurley Ave.
    Hurley, NY  12443

                                *Plaintiffs*,

        v.

GREYHOUND LINES, INC.,
    350 N. St. Paul St.
    Dallas, Texas 75266-0362

                          *Defendant*.

Case No. _____

**Jury Trial Demanded**

## COMPLAINT

Plaintiffs Adirondack Transit Lines, Inc. (d/b/a Adirondack Trailways), and its corporate affiliates, Pine Hill-Kingston Bus Corp. (d/b/a Pine Hill Trailways), and Passenger Bus Corporation (d/b/a New York Trailways) (collectively "Trailways of New York," "Trailways," or "Adirondack") bring this Complaint against Greyhound Lines, Inc. ("Greyhound") for breaches of a Settlement Agreement and Release that are intended to cause imminent and irreparable harm to Trailways.

### INTRODUCTION

1.     Plaintiff Trailways provides intercity bus service across New York State and north to Montreal, Quebec and to Toronto, Ontario in Canada.  Trailways provides service between major cities, and it also provides local service connecting more rural areas of New York to those major city travel corridors.

1

2.      Defendant Greyhound provides intercity bus service nationwide, and it has the most comprehensive networks in the U.S.  In general, it provides service on major corridors but not rural service.  It does not provide rural service in New York State.

3.      To provide convenient ticket-purchasing and service for passengers travelling between points that are served by Trailways and points served by Greyhound, the parties have interlined with one another for decades.  The parties have interlined for at least 40 years and continued to interline with one another on all schedules they each operate, without exclusion.  That is the status quo.

4.      This means, for example, that a passenger can buy a single ticket from Greyhound, which allows them to begin their travel on a Trailways schedule (for example, Watertown, New York) then connect to a Greyhound schedule for service to some other city (for example, connecting in Buffalo, New York for service west to Cleveland, Ohio).  The passenger's trip may end at that Greyhound-serviced city, or the passenger may transfer from a Greyhound bus to a third carrier that interlines to serve other locations.  The same is true in reverse: the passenger could purchase a single ticket from Greyhound allowing them to travel from a distant location served by Greyhound (for example, Richmond, Virginia), then connect to a Trailways schedule (for example, in New York City), and then to a schedule serving a local New York State destination that is serviced only by Trailways and not by Greyhound (for example, Lake Placid, New York).

5.      Interlining with Greyhound is a significant portion of Trailways's business.  Interlining with Greyhound significantly expands Trailways's network by expanding the geographical locations it can sell, and it significantly expands Trailways's sales by allowing a customer using Greyhound's sales platforms to see and select interline itineraries which involve travel over any of Trailways's schedules.  Interlining also benefits the traveling public by allowing

passengers to conveniently purchase tickets and travel between destinations served by Trailways and destinations outside of New York State served by Greyhound and other carriers.

6.      Greyhound and Trailways are also parties to a Revenue Pooling Agreement, signed in May 1997 (together with subsequent written amendments, the "Pooling Agreement").  Pursuant to the Pooling Agreement, Greyhound and Trailways pooled the revenues that they derived from schedules they each operated on the major East-West and North-South corridors in New York State (the "Pool"), and they distributed those revenues between the two carriers.  A true and correct copy of the Pooling Agreement is attached as Exhibit A.  The term of the Pooling Agreement is 30 years.

7.      During the performance of the Pool, several disputes arose between the parties, which led to a non-binding arbitration and then litigation.  The disputes were resolved pursuant to a settlement agreement reached in July 2017.  A term sheet outlining the terms of the settlement was signed on July 13, 2017 (the "Term Sheet").  A true and correct copy of the Term Sheet is being filed as Exhibit C.  (It is being filed under seal because the parties agreed that the Settlement Agreement is confidential.)  Approximately one year later, on July 3, 2018, the parties executed a Settlement Agreement and Release (the "Settlement Agreement").  A true and correct copy of the Settlement Agreement is being filed under seal as Exhibit B.

8.      As explained in more detail below, in the Term Sheet and in the Settlement Agreement, the parties recognized that the Pool would come to an end in the foreseeable future. At one point during those discussions, Greyhound took the position that when the Pool ended, it would view Trailways as a direct competitor and would therefore no longer interline with Trailways.  That statement caused Trailways grave concern, because during those same negotiations, Greyhound was also demanding that Trailways make significant concessions,

including moving to Greyhound's back-end ticketing technology, a change that would threaten Trailways's ability to survive if, at the end of the Pool, Trailways was not able to Interline with Greyhound.  It was vital for Trailways to maintain the status quo of interlining with Greyhound beyond the end of the Pool, thus providing both Trailways and the public the benefits of interlining described above.  In exchange for significant concessions, Trailways bargained for, and the parties agreed that, "Greyhound shall continue interlining with Trailways for a minimum of two years after the termination of the Pool."  (Settlement Agreement ¶ 21)  They also agreed that "[t]he Parties shall consider in good faith further interlining beyond that date."  (Id.; see also Term Sheet ¶ 16, "Greyhound agrees to interline with ADT for two years after the termination of the pool and to consider in good faith further interline beyond that date.")

9.      In late 2021, Greyhound was acquired by FlixMobility.  Shortly after the acquisition, in 2022, Greyhound provided notice that it intended to terminate the Pool effective June 1, 2022.  This means that Trailways and Greyhound are competitors on routes where they pooled service and revenues since 1998.  Trailways's concerns at the time of the above-described settlement foreshadowed exactly what Greyhound has done.  To put financial distress on Trailways as it embarks on competing with Greyhound over those major New York corridors, Greyhound has informed Trailways that it will breach its agreement to continue interlining for a minimum of two years after termination of the Pool.  At the same time that it provided notice terminating the Pool, Greyhound provided notice that it intended to "terminate the interline relationship" with Trailways.  After Trailways reminded Greyhound of its agreement to continue interlining with Trailways for two years after termination of the Pool, Greyhound says it will not continue to interline with Trailways unless it agrees to "modified interlining" on some but not all routes, contrary to their agreement and practice for decades.  Greyhound says it will selectively interline

4

over routes of its unilateral choosing, and in effect will divert passengers who would have taken a Trailways bus for part of their trip to a Greyhound bus.  This improperly diverts revenue away from Trailways and denies passengers the option to choose the most convenient schedule.  Because the abrupt changes Greyhound seeks to implement will cause irreparable and immeasurable harm to Trailways in breach of the agreement, and will harm the traveling public's ability to purchase tickets for and travel between New York destinations served by Trailways and other destinations that can be reached by interlining with Greyhound, Trailways brings this suit seeking to remedy Greyhound's breach and maintain the status quo of interlining between the parties.

**PARTIES**

**A.     Plaintiffs.**

10.     Plaintiffs Adirondack Trailways, Pine Hill Trailways and New York Trailways are each privately owned intercity bus companies that operate under a common private ownership. Each is a corporation organized and existing under the laws of the state of New York and maintains its principal place of business at 499 Hurley Ave., Hurley NY 12443.

11.     Trailways is one of the largest intercity bus providers in New York.  It has served the New York traveling public for nearly one hundred years, and has been a family-owned business since it was founded in 1926.  Its principal owner and Chief Executive Officer is the grandson of its founder.

12.     Trailways provides intercity bus transportation throughout the entire state of New York, including both main corridors connecting large cities such as New York City, Buffalo, and Albany, and rural communities located off of the main corridors.  Adirondack Trailways and Pine Hill Trailways operate primarily in the eastern part of New York State and north to Montreal, Quebec, and New York Trailways operates primarily in the Western part of New York State and as far south as New York City.  A true and correct copy of a map depicting these routes is being

filed as Exhibit D.  On its major city-pair routes in New York State, Trailways also provides pooled services with Greyhound under their Pooling Agreement, described below.  The routes on which Trailways and Greyhound provide pooled service are shown in blue on Exhibit D.  Trailways also operates a number of bus stations in New York State, and it serves other bus stations in both New York and Canada.  Greyhound and Trailways have always interlined, without exclusion, on all of the routes shown on Exhibit D.  Greyhound's sales outlets (including Greyhound.com) have sold, without exclusion, interlining Trailways tickets over all of the routes shown on Exhibit D.

**B.** **Defendant.**

13.  Defendant Greyhound Lines, Inc. is a corporation organized and existing under the laws of Delaware and maintains its principal place of business at 350 N. St. Paul Street, Dallas, Texas 75201.  Until late 2021, Greyhound was a wholly owned subsidiary of FirstGroup plc, a publicly traded company in the United Kingdom.  In late 2021, FirstGroup announced it had sold Greyhound to FlixMobility, a company based in Germany.  Greyhound provides intercity bus transportation across the United States (including along the major corridors of New York State) and also in Canada and Mexico.  Defendant Greyhound agreed that it would accept service of process for disputes arising under the Settlement Agreement, and it may be served at CT Corporation, 1015 15th Street, NW, Suite 1000, Washington, DC 20005.

## JURISDICTION AND VENUE

14.  This is a civil action seeking judgment, injunctive relief and damages.  This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332(1) because the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different States.

15.     Venue is proper in this district under 28 U.S.C. § 1391 because the parties agreed in section 46 of the Settlement Agreement:

> The United States District Court for the District of Columbia shall hear and determine any disputes that arise under or on account of the [Pooling Agreement] or this Agreement, without a prerequisite to arbitration.  Each Party consents to jurisdiction and venue in such court and agrees to accept service of process for such matter.

In addition, Greyhound provides intercity bus transportation to Washington, DC, and customers travel between New York State and Washington, DC on Trailways buses that connect with Greyhound buses pursuant to the parties' agreement to interline.

## FACTS

**A.     Interlining.**

16.     Interlining refers to an arrangement where two or more transportation companies coordinate to allow customers to purchase transportation, in a single transaction with one of the companies, for travel between origins served by one operator and destinations served by another, and where tickets sold by one carrier is honored by the other. In the words of the United States Department of Transportation:

> **What is interline service?**
>
> An interline trip involves a passenger purchasing a ticket or making a reservation with one operator for a fixed-route trip of two or more stages, in which another operator provides service for one or more of the transportation stages.  For example, a passenger goes to the ticket office of Operator X, a large, fixed-route operator, and buys a ticket from Point A to Point C. The ticket provides for the passenger to transfer at Point B to a bus operated by small, fixed-route Operator Y. This arrangement is an interline trip.[1]

---

[1] U.S. Dep't of Transp., Office of the General Counsel Guidance on Interline Service and Notice to Passengers, https://bit.ly/3zowWKL (last viewed June 7, 2022)).

17.     Interlining allows a transportation company to provide convenient service between city-pairs beyond a geographic region that it serves, thus expanding its network.  It allows passengers purchasing tickets from a large carrier to conveniently purchase connecting service on smaller carriers in the same transaction, and vice versa.  It also allows passengers more convenient options for bus connections.  Interlining is common among companies that provide passenger and freight transportation, such as bus lines, railroads and airlines.

18.     As described above, Trailways primarily serves cities and towns in New York State, and without interlining it could sell tickets and provide service only between the city-pairs it serves. However, by interlining with Greyhound, it can provide its customers more options.  They can purchase a ticket to travel between cities served by Trailways and cities served by Greyhound outside Trailways's region.  Interlining with Greyhound also allows Trailways to provide sales to destinations served by third party bus companies through connections with Greyhound.  When bus companies interline, they allocate the revenue, typically by prorating according to the mileage operated by each.

19.     Interlining significantly benefits bus companies because they can extend their network and provide convenient sales to their customers to destinations they do not otherwise serve.  Interlining expands the sales Trailways can provide to customers in New York, and it brings customers outside of New York to Trailways routes.  Similarly, interlining allows Greyhound to serve customers in rural cities and towns in New York where it does not otherwise provide service, and to provide customers more options for travel in New York on routes where both Greyhound and Trailways operate.

20.     Interlining also benefits the traveling public.  Passengers can go to one bus company and buy a single ticket for an interline itinerary rather than having to search and compare

schedules and prices of multiple bus companies to try to find a combination that will transport them to the desired destination at a time and price they prefer.  Bus companies often organize their schedules to make interline connections reliable and convenient for customers.  Interlining is the mechanism used to provide convenient bus service between points served by different bus operators.

21.     Because of the obvious benefits of interlining, interlining is routine in the bus industry.

22.     Trailways has been interlining with Greyhound for decades.  They have interlined so long that its current CEO (the third generation of the family-owned business) does not know how long they have interlined, but he knows that they were interlining long before he began working for the company forty years ago.  The terms pursuant to which they interline have been established by written documents and their course of performance over many years.

23.     Greyhound and Trailways continued to interline through June 1, 2022.  Greyhound said it would continue to interline on the same terms for seven more days while the parties tried to negotiate a resolution to this dispute.  On June 6, 2022, Greyhound said it would stop all interlining, and stop all sales of Trailways tickets, as of 12:01 a.m. on June 8, 2022.  As explained below, that is a breach of Greyhound's contractual obligations to continue interlining with Trailways.

B.      **The Pool.**

24.      In the 1990s, Greyhound was in financial trouble.  It was suffering from aggressive competition, including competition from regional bus carriers such as Trailways.  Greyhound's former President approached Trailways and proposed brokering a revenue pooling arrangement under which the companies would cease competing along the major corridors of New York State and would instead pool their operations and revenues.  Under federal law, if the Surface Transportation Board approves such a pooling agreement, the agreement is exempt from federal and state antitrust laws as necessary to carry out the pooling arrangement.  49 U.S.C. § 14302(f). Under the revenue pool concept, Greyhound and Trailways would operate along the pooled corridors together as partners in a joint venture.  Through the arrangement, they would coordinate operations along the pooled corridors to provide convenient service to customers throughout the day.

25.      Trailways and Greyhound executed the Pooling Agreement in May 1997 to form the Pool.  The Pooling Agreement provides that its 30-year term would begin on the date of the STB's approval of the agreement.  The Surface Transportation Board found that the pooling arrangement set forth in the Pooling Agreement was in the public interest of the traveling public in New York State, and it approved the Pooling Agreement in STB Decision No. MC-F-20910 (December 18, 1997).  Trailways and Greyhound began pooled operations shortly thereafter in 1998.

26.     Under the Pooling Agreement, Trailways and Greyhound agreed to pool their intercity bus service between Albany, NY and New York City; Buffalo, NY and New York City; Buffalo, NY and Albany, NY; and New York City and Montreal, PQ, Canada.[2]

27.     The Pooling Agreement allocated to Greyhound and Trailways a set annual percentage of the revenue miles operated in the Pool, and it allocates to each a percentage of the revenue collected through the Pooled operations.  The parties coordinated their bus schedules, while allocating the mileage operated and the revenues generated according to the percentages set forth in the Pooling Agreement. In addition, Trailways operates bus terminals at certain locations along the Pool routes, and Greyhound operates bus terminals at others.

28.     Trailways and Greyhound operated the Pool under the Pooling Agreement, as amended from time to time, since 1998 until June 1, 2022.

**C.     The Settlement Agreement.**

29.     During the performance of the Pool over many years, a series of disputes arose between the parties about a variety of issues.  The parties litigated those disputes in a non-binding arbitration[3] from December 2013 through October 2015, and then in federal court from October 2015 to July 2018.

30.     The parties resolved their dispute in the Settlement Agreement, which was executed on July 3, 2018.  (See Ex. B)  The Settlement Agreement reflects the parties' agreement about a variety of issues regarding the operation of and accounting for the Pool.  It also sets forth

---

[2] By subsequent agreement, service north of the Canadian border was no longer governed by the Pool.

[3] The Pooling Agreement required the parties to try to resolve disputes pursuant to non-binding arbitration before they could seek legal or equitable remedies.  (Pooling Agreement § 26)  The parties removed that obligation in paragraph 46 of the Settlement Agreement, which provides that this Court "shall hear and determine any disputes that arise under or on account of the [Pooling Agreement] or this Agreement, without a prerequisite for arbitration."

obligations about how Trailways and Greyhound will do business for certain matters outside the Pool.

31.     One of those obligations is continuing to interline.  One of the major disputes in the parties' prior arbitration and litigation involved Trailways's sale of tickets for travel over the Pooled routes on its website using its own ticketing technology, known as Gateway.  Those Trailways tickets for travel over the Pooled routes were printed on Trailways ticket stock (also known as ticket paper) using Trailways's carrier codes (not Pool paper using Pool carrier codes). Once redeemed for travel by passengers, those Trailways tickets were processed for payment by Greyhound through the interline reclaim process and not through the Pool settlement process.  This interline treatment was consistent with the Parties' long-standing interline history.

32.     Trailways's use of its own ticketing technology for interline tickets over the Pooled routes became inconvenient for Greyhound.  One major reason for that is because Greyhound decided that it wanted to transition its service model away from the historical intercity bus transportation model.  Under that historical model, bus carriers endeavored to provide passengers with on-demand service.  The carriers used a variety of factors, including historical sales trends and advanced sales information, to predict how popular a particular schedule would be.  The carriers then had back-up buses and drivers on standby, and they endeavored to provide service on passengers' desired schedule to as many passengers as presented at the terminal to take that schedule.  Greyhound had decided to move away from that historical model, and to a restricted capacity model known as managed capacity.  Under Greyhound's desired managed capacity model, a carrier would require a passenger to have an advanced reservation in order to expect a seat on a given schedule.

33.     In order for Greyhound's desired managed capacity system to work, Greyhound insisted that all sales interlining with Greyhound must be made using Greyhound's ticket-selling technology, known as TRIPS.  Greyhound insisted that this consolidation to the TRIPS technology was necessary so that Greyhound would know when a given schedule had reached capacity and needed additional capacity to be added or to stop selling more tickets.  As a result, Greyhound demanded that Trailways transition all of its sales to using TRIPS, rather than Trailways's own technology.

34.     Trailways was very reluctant to embrace Greyhound's desired new service model, because Trailways highly valued the flexibility that the traditional model offered to its customers – which it believed, in turn, led to increased customer loyalty and ridership.  In addition, Trailways knew that the Pool would eventually end.  It was very reluctant to forfeit its ability to sell tickets using its own technology (which were sold on Trailways paper and handled through the interline reclaim process), as Greyhound was demanding.  Using Greyhound's technology exclusively would give Greyhound a comprehensive picture of Trailways's sales, which Greyhound would then be able to use to its advantage when the Pool ended and the companies began to compete.  In addition, using Greyhound's ticketing technology would make it harder for Trailways to add enhancements, such as mobile ticketing, than it could if it were using its own technology.  Further, because TRIPS is entirely controlled by Greyhound, Trailways would become dependent on Greyhound to implement any new features relating to ticket sales and service.

35.     Trailways understood and explained to Greyhound that Greyhound was asking Trailways to give up something very significant at that time, which would make it difficult for Trailways to succeed once the Pool ended.  At the time of the Settlement Agreement, Greyhound was selling about 80% of the Pool and interline tickets.  Once the Pool ended, Trailways needed

to be able to increase significantly the sales by multiples on its own website, which would be difficult if it had surrendered the ability to sell tickets using its own technology.  Trailways also understood that it would be difficult to quickly create and transition to a new ticket selling technology due to its dependence on Greyhound.

36.    In the course of those negotiations, a Greyhound executive admitted to Greyhound's view that, once the Pool ended (at that time, approximately 10 years down the road), Greyhound would cease interlining with Trailways because Greyhound would be a competitor to Trailways.   That alarmed Trailways, especially because Greyhound was simultaneously demanding that Trailways become more reliant on Greyhound in the interim by moving to the TRIPS ticketing technology.  Greyhound's foreshadowing of its post-Pool plans made it essential for Trailways to maintain the status quo for continued interlining after the Pool ended to ensure a reliable source of passengers and revenues for Trailways to survive.   Eventually, Trailways acquiesced to Greyhound's insistence, but only on the express condition that Greyhound continue interlining with Trailways after the end of the Pool.  It is that agreement to continue interlining that Greyhound has breached.

37.    As explained above, continued interlining is essential to Trailways's business, and Trailways wanted to continue uninterrupted interlining with Greyhound after termination of the Pool.   Trailways also recognized that the termination date of the Pooling Agreement was approaching in 2027, and it wanted to ensure the parties would continue interlining for at least two years as Trailways transitioned away from operating as part of the Pool.  Thus, the parties agreed in paragraph 21 of the Settlement Agreement:

21.    The Parties acknowledge that there is no current written interline agreement between the Parties and they agree to collaborate and enter into such an Agreement in good faith. The parties agree to work together in good faith towards completing the negotiations and entering into a new interline agreement within two months following the execution date of

14

this Agreement. **Greyhound shall continue interlining with Adirondack for a minimum of two years after the termination of the Pool.** The Parties shall consider in good faith further interlining beyond that date.

(Emphasis added.)

38.     Trailways agreed to make itself dependent on Greyhound by exclusively using Greyhound's ticketing technology, but only in return for Greyhound's agreement to continue interlining for two years after the Pool ended. Trailways insisted on continued interlining for two years in order to ensure it could continue to serve its interline customers, which represent a large portion of its business, and to ensure a steady source of revenue as customers adjusted to purchasing Trailways tickets on Trailways's web site and new ticketing system. Trailways insisted on the two-year time period because it estimated it would take that long for customers to become accustomed to purchasing tickets directly from Trailways. The agreement to continue interlining was necessary to ensure Trailways's continued existence after the Pool terminates.

39.     The parties agreed that the scope of continued interlining would be to maintain the status quo for two years. This means they would continue interlining over the same routes and schedules after the Pool ends as they did while the Pool was in operation.

40.     As agreed, Trailways stopped selling tickets using the Gateway system in reliance on Greyhound's agreement to continue interlining for two years after the termination of the Pool. Greyhound has enjoyed the benefits of Trailways's performance of its end of the bargain for the four years since the parties executed the Settlement Agreement.

**D.     Greyhound's Breach of the Agreement to Continue Interlining.**

41.     In late 2021, Greyhound was purchased by FlixMobility. The change in control of Greyhound triggered a provision allowing either party to terminate the Pooling Agreement. Greyhound served notice that it intended to terminate the Pool effective June 1, 2022.

42.     On approximately February 28, 2022, Greyhound informed Trailways that it would not continue to interline with Trailways beyond June 1, 2022.  Trailways has attempted to resolve the issue with Greyhound, without the need for court intervention.  However, those efforts failed. Greyhound agreed to continue the status quo interlining for seven days to June 7, 2022.  On June 6, 2022, Greyhound informed Trailways that it would stop interlining, and stop sales of Trailways tickets, starting 12:01 a.m. on June 8, 2022.  This breach of the Settlement Agreement denies Trailways the substantial revenues it receives from interline service, shrinks its network, denies its passengers the ability to travel conveniently on interline service, and harms Trailways's reputation with its customers.  Greyhound's breach harms both Trailways and the traveling public.

43.     Greyhound refuses to interline unless Trailways agrees to significantly reduce the routes where they interline, in what Greyhound calls "modified interlining."  Historically, and until June 8, Trailways and Greyhound have continually interlined with all routes served by Trailways and all routes served by Greyhound.  This includes routes that were served by the Pool on the major corridors, as well as routes served only by one party or the other.  The parties agreed in the Settlement Agreement to continue interlining over those routes after the Pool ends.  However, under Greyhound "modified interlining" it would stop selling interline tickets for Trailways schedules on routes previously served by (both Greyhound and Trailways, via) the Pool.  (These are referred to as legacy pool routes.)

44.     Greyhound refuses to perform its agreement to "continue interlining" unless Trailways agrees to change from the status quo to "modified interlining" demanded by Greyhound. Greyhound is holding its agreement to continue interlining hostage, refusing to comply unless Trailways surrenders valuable rights for which it bargained and performed its side of the agreement.   Greyhound's  "modified  interlining"  would  change  the  way  the  parties  have

continually interlined in order to divert passengers and revenues from Trailways. Under the status quo, an interlining passenger could transfer to either a Trailways bus or a Greyhound bus at a connecting point on the legacy pool routes. Greyhound demands to change the status quo to require the passenger to transfer only to a Greyhound bus at those connecting points, including passengers who would previously transfer to a Trailways bus. For example, if a passenger is traveling from Watertown, NY to Richmond, Virginia, they would take a Trailways bus from Watertown to Syracuse (a connecting point on the legacy pool routes), transfer to a bus from Syracuse to New York City, and transfer to another bus from New York City to Richmond. Under the status quo, for the leg of the trip from Syracuse to New York City, the passenger could transfer to either a Trailways bus or a Greyhound bus to New York City. Now, Greyhound says it will sell an interline ticket permitting travel only on a Greyhound bus for the Syracuse to New York City leg. This diverts away from Trailways the passengers who would otherwise take a Trailways bus for that leg, and divert that revenue from Trailways to Greyhound. Further, because Trailways organizes its schedules to make the transfer at Syracuse to a Trailways bus convenient to passengers, Greyhound's practice will make interline travel less convenient for passengers.

45. Greyhound's refusal to continue interlining at all with Trailways will cause significant harm to Trailways and its customers. Greyhound's refusal to interline with Trailways's legacy pool routes would also cause significant injury to Trailways because they represent a substantial portion of Trailways's revenues. Trailways estimates that Greyhound sells approximately 80% of Trailways's interline tickets. As a result, Greyhound's refusal to continue offering those Trailways interline schedules to customers will significantly shrink Trailways's sales. It will impair Trailways's ability to offer convenient connections, especially to its passengers connection to or from rural locations in New York. It will diminish Trailways's brand

and reputation among customers because they will perceive that Trailways's service is much less convenient.  Customers are likely to turn to competitors, alternative forms of transportation, or they may not travel at all.  It will threaten Trailways's continued existence as it transitions away from the Pool.

46.     Greyhound is refusing to continue interlining with Trailways with the intention of causing those injuries to Trailways.  It seeks to improperly divert passengers and revenue from Trailways to Greyhound.  It seeks to gain an unfair competitive advantage by causing financial harm to Trailways at the time they will start to compete, as well as from the diminishment of Trailways's image among the traveling public.  Greyhound wants to make it inconvenient and confusing for the traveling public to purchase transportation for travel on Trailways if the city can also be reached using a different (even if less convenient) Greyhound schedule.

47.     Greyhound's refusal to continue interlining on the routes they have served is a breach of the parties' agreement in the Settlement Agreement to continue interlining for two years following termination of the Pool.

48.     Greyhound has justified its refusal to continue interlining because the parties have not signed a separate written interline agreement.  As noted above, the parties agreed to "work together in good faith towards completing the negotiations and entering into a new interline agreement within two months".  (Settlement Agreement ¶ 21)  Greyhound says that it has no obligation to continue interlining because the parties did not sign a written interline agreement within two months of the Settlement Agreement or to this date.

49.     Greyhound cannot avoid its obligation to continue interlining with Trailways for two years after the Pool terminates, for at least the reasons stated below.

a.      Greyhound's obligation is clear and unambiguous:  "Greyhound shall continue interlining with Adirondack for a minimum of two years after the termination of the Pool."  (Settlement Agreement ¶ 21)  It is not conditioned on executing an additional interline agreement.  The other provisions in paragraph 21 do not create such a condition.

b.      If there were any ambiguity in the Settlement Agreement, the term sheet clearly expresses the parties' intent:  "16.  Interline.  Greyhound agrees to interline with ADT [Trailways] for two years after termination of the pool and to consider in good faith further interlining beyond that date."  (Term Sheet ¶ 16, Ex. C)  The term sheet says nothing about an separate interline agreement.

c.      The parties intended to continue interlining at current levels.  The parties used the phrase "continue interlining" to express their intent to interline over the same routes and maintain the status quo.  If they had intended to agree to interline on only some routes, they would have said so rather than agreeing to "continue interlining" without limitation or condition.  The agreement to continue interlining was intended to entice Trailways to agree to cease using its own technology to sell tickets for travel over the Pooled routes that were then being submitted for interline reclaim by Greyhound.  Ironically, these are now the very tickets that Greyhound seeks to carve out of its obligation to continue interlining with Trailways.  The agreement to continue interlining was intended to provide a stable source of revenue to Trailways and to ensure it could continue to provide convenient interline service to customers after the Pool terminates.  Those purposes would be defeated if interlining were drastically modified, as Greyhound intends.  Trailways would not have surrendered its valuable right to continue to sell tickets using its own

ticketing technology if Greyhound had stated in the Settlement Agreement that it would interline on less than all routes.

        d.     Greyhound has contended that the requirement to negotiate an interline agreement is an unenforceable agreement to agree.  However, paragraph 44 of the Settlement Agreement provides:

> If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or otherwise unenforceable, the remaining provisions shall nonetheless continue in full force and effect without being impaired or invalidated in any way.

Thus, if the provisions regarding negotiating an interline agreement are unenforceable, the parties agreed that they should be severed and the remaining provisions should be enforced. The sentence requiring the parties to continue interlining for two years can be severed from the other provisions because it does not refer to negotiating a written interline agreement.

50.    The agreement to continue interlining in the Settlement Agreement contains the essential elements of the parties' agreement to continue interlining.  Further details need not be spelled out in the Settlement Agreement, as evidenced by the parties' other written documents and their performance of continued interlining both before and after the Settlement Agreement was signed in 2018.

## CAUSE OF ACTION

51.    Trailways repeats and realleges paragraphs 1 through 48 above.

52.    Greyhound agreed in the Settlement Agreement at paragraph 21 that "Greyhound shall continue interlining with Adirondack for a minimum of two years after the termination of the Pool."  Greyhound has refused to continue the status quo of interlining with Trailways after the termination of the Pool on June 1, 2022.  It has stopped selling any interline tickets with Trailways,

and it says it will interline on some routes only if Trailways agrees they will not interline on legacy pool routes.

53.     Trailways has been and will be injured by (a) the revenues it will lose from customers who would have travelled on Trailways buses on interline itineraries; and (b) the injury to its brand and reputation because customers will perceive Trailways as being unable to provide intercity bus transportation to the destinations served by (i) Greyhound and (ii) third party bus companies that customers could connect with through Greyhound.   Those injuries cannot reasonably be measured and are irreparable.

54.     Greyhound's breach harms the traveling public because it limits the ability of the public to purchase tickets for convenient interline bus transportation between cities served by Trailways and cities outside of Trailways's service area that can be reached only by interlining with Greyhound.   Greyhound's refusal to interline at all unless it excludes legacy Pool routes would force customers to take less convenient buses at connecting points on the Pool.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter each of the following forms of relief:

        a.     An injunction maintaining the status quo for continued interlining, as the parties agreed in the Settlement Agreement;

        b.     An injunction requiring Greyhound to continue interlining with Trailways for two years after the termination of Pool pursuant to the same terms established by their written documents and course of performance for many years;

        c.     An award of the costs that Trailways has incurred as a result of Greyhound's breach;

      d.      In the alternative, money damages if the Court determines that Trailways's injuries are not irreparable and can be compensated by money damages;

      e.      An award of the attorneys' fees, costs and expenses Trailways has incurred in connection with this action; and

      f.      Such other relief as is just and proper.

## JURY DEMAND

Plaintiffs hereby demand a jury trial.


Dated:  June 9, 2022

                                */s/ Alden L. Atkins*
                                Alden L. Atkins (DC Bar No. 393922)
                                Crystal Y'Barbo Stapley (DC Bar No. 1003494)
                                Rami Abdallah E. Rashmawi (DC Bar No. 1780184)
                                VINSON & ELKINS LLP
                                2200 Pennsylvania Ave. NW
                                Suite 500 West
                                Washington, DC  20037
                                (202) 639-6500
                                aatkins@velaw.com
                                cstapley@velaw.com
                                rrashmawi@velaw.com

                                *Attorneys for Plaintiffs Adirondack Transit Lines, Inc., Pine Hill-Kingston Bus Corp., and Passenger Bus Corporation*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 9, 2022, a copy of the foregoing Complaint was served by

e-mail on the following counsel for Defendant:

Joseph N. Froehlich
Locke Lord
Brookfield Place
200 Vesey Street, 20th Floor
New York, NY  10281
jfroehlich@lockelord.com

_/s/ Alden L. Atkins_
Alden L. Atkins
VINSON & ELKINS LLP
