## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ADIRONDACK TRANSIT LINES, INC.,** *et al.*, | |
| *Plaintiffs,* | **Case No. 1:22-cv-1662-RCL** |
| **v.** | ***FILED UNDER SEAL*** |
| **GREYHOUND LINES, INC.,** | |
| *Defendant.* | |

### MEMORANDUM OPINION

For decades, plaintiffs (collectively known as "Trailways") and defendant ("Greyhound") have worked together to serve the intercity busing needs of New York State. On June 9, 2022, Trailways filed for emergency relief in this Court, alleging that Greyhound was in the process of breaching the contractual agreement governing the parties' joint activities—specifically, that Greyhound had suddenly upended a promise to "continue interlining" with Trailways. Trailways further alleged that this breach of contract threatened to impose substantial and difficult-to-discover monetary and reputational harms. Greyhound argued that it breached no enforceable contract. The Court issued a temporary restraining order ("TRO"), ECF No. 9, and later extended it for two weeks, ECF No. 21. While Trailways has established that it is likely to succeed on the merits of its breach of contract claim, it has failed to justify injunctive relief. Therefore, the Court will **DENY** Trailways's motion for a preliminary injunction by separate order.

### I.    BACKGROUND

Two bus companies, once allied in the mission to transport intercity passengers in New York State, now find themselves at irreconcilable odds. Trailways is a large independent bus

company primarily serving New York State.  Trailways Mem. in Supp. ("Trailways Mot.") 2, ECF No. 6.  Greyhound operates the largest intercity bus service in the country.  *See id.*

The parties have spent decades working together.  First, they interlined their bus services as far back as 1988.  Eugene J. Berardi, Jr. Decl. ("Eugene Berardi Decl.") ¶ 19.  Then, in 1997, the companies contracted to coordinate bus services and revenue on certain New York State routes.  Eugene Berardi Decl. ¶ 26.  Finally, after multiple disputes arose out of that 1996 contract, the parties signed an additional contract in 2018 settling past disputes and committing to various terms of coordination moving forward.  *Id.* ¶ 30.  That 2018 settlement agreement is the subject of this dispute.

## A.  The Parties' Interlining Relationship

Since at least 1988, Greyhound and Trailways have engaged in a common industry practice known as "interlining."  Eugene Berardi Decl. ¶ 19.  When bus operators agree to "interline," they "agree that customers can purchase a single ticket to travel from their origin (served by one operator) to their destination (served by another operator)," and ensure that "a ticket sold by one carrier is honored by the other."  *Id.* ¶ 9.  Interlining allows customers to begin a trip with one bus company and end the trip with another through a single purchase.  *Id.* ¶ 11; Greyhound Opp'n 12–13, ECF No. 19.  Suppose a customer wants to travel from Watertown, New York to Richmond, Virginia and that Trailways only offers services from Watertown to New York City, while Greyhound only offers services from New York City to Richmond.  *See* Eugene Berardi Decl. ¶ 11.  Interlining allows a customer to easily travel from Watertown to Richmond, by switching both buses and carriers in New York City, all on a single ticket.  *See id.*   Both parties agree that interlining includes these kinds of purchases.  Eugene Berardi Decl. ¶ 11; Greyhound Opp'n 12–13.





ECF No. 19-10.

But Trailways asserts that "interlining" encompasses something more.  In Trailways's view, "interlining also includes the sale by one bus carrier for travel on another carrier."  Trailways Reply 4, ECF No. 20; *see* Eugene J. Berardi, Jr. Second Decl. ("Eugene Berardi Second Decl.") ¶¶ 8–11, ECF No. 20-1.  That is, Trailways argues that interlining also covers when a bus company ("seller") sells a travel ticket to a passenger to ride on a different bus company's bus ("carrier"), even though the passenger never transfers from a bus operated by carrier to a bus operated by seller.  Take the earlier example.  Under Trailways's understanding, "interlining" also includes a customer traveling from Watertown to New York City on a Trailways bus—even though the customer bought that ticket through Greyhound, and even though the customer did not travel past New York City.  Greyhound strongly disputes that definition and asserts that interlining only covers trips where a transfer from seller to carrier, or vice versa, occurs.  Greyhound Opp'n 13, 23; *see* ECF No. 19-10 (diagramming Greyhound's interline definition).  Moreover, even when a

ticket *would* include a transfer between bus companies, Greyhound argues that interlining does not include sales of tickets between points that are served by both firms.  Greyhound Opp'n 22.

Whatever the proper definition, bus companies that interline must allocate revenue, among other necessary conditions, for sales of interline tickets.  Trailways asserts that the parties' longstanding practices, industry standards, and Greyhound's Passenger Fare Sales Manual supplied and still supply these conditions.  *See* Eugene Berardi Decl. ¶ 15 (asserting that Greyhound and Trailways prorate by miles operated on an itinerary to allocate interline revenue); Trailways Reply 4–6 (pointing to the National Bus Traffic Association's manual for interlining to supply industry-standard definitions and terms); Eugene Berardi Second Decl. ¶¶ 9, 16; ECF No. 20-4; ECF No. 20-9.  And Greyhound agrees that it interlined with regional carriers like Trailways for decades without any comprehensive signed writings save for a short "Tariff Participation Agreement."  Greyhound Opp'n 7–8.

In 2012, after decades of interlining without comprehensive written terms, Greyhound decided that it would propose comprehensive interline agreements to its regional carriers.  Greyhound Opp'n 8.  Greyhound asserts that all relevant regional carriers signed new written interlining agreements—all except Trailways.  *Id.*

### B.  The Revenue Pooling Agreement

In 1996, Greyhound approached Trailways about a type of coordination separate from interlining: revenue pooling.  Eugene Berardi Decl. ¶ 24.  At the time, the two companies were already operating under a *service* pooling agreement, under which the firms coordinated the scheduling of buses on certain routes.  *Id.*  But, with the proposed *revenue* pooling agreement, the firms would not just coordinate the scheduling of pooled routes; they would also share the revenue on those routes.  *Id.*; Greyhound Opp'n 4; Todd Koch Decl. ("Koch Decl.") ¶ 3, ECF No. 19-1.

In May of 1997, Trailways and Greyhound signed the Revenue Pooling Agreement for a thirty-year term.  ECF No. 1-1; *see* Trailways Mot. 2; Eugene Berardi Decl. ¶ 26.  The Agreement sets out revenue and mileage percentages governing the parties' relationship as well as a variety of other important terms.  ECF No. 1-1; Eugene Berardi Decl. ¶ 27.  The Revenue Pooling Agreement also mandates informal consultation and then arbitration in the event of a dispute.  ECF No. 1-1 ¶ 23.

### C.  The Parties' Prior Contract Dispute and Settlement Agreement

In late 2013, the parties utilized the dispute resolution provision in the Revenue Pooling Agreement with each alleging violations by the other.  Greyhound and Trailways participated in an arbitration, after which both parties resorted to federal court remedies.  Eugene Berardi Decl. ¶ 29; Greyhound Opp'n 4–5.  Several years later, in 2018, the parties were finally able to resolve their disputes by signing the Settlement Agreement and Release ("Settlement Agreement").  ECF No. 2-1; Eugene Berardi Decl. ¶ 30; Greyhound Opp'n 6.[1]

Paragraphs 21 and 22 of the Settlement Agreement read as follows:

<u>INTERLINE</u>

> 21. The Parties acknowledge that there is no current written interline agreement between the Parties and they agree to collaborate and enter into such an Agreement in good faith. The parties agree to work together in good faith towards completing the negotiations and entering into a new interline agreement within two months following the execution date of this Agreement. *Greyhound shall continue interlining with Adirondack for a minimum of two years after the termination of the Pool.* The Parties shall consider in good faith further interlining beyond that date.

> 22. Nothing herein shall affect either Party's right to determine, in its sole discretion but in good faith, to stop operating any schedule

---

[1] Among the Settlement Agreement's many terms was the elimination of the arbitration requirement and subsequent selection of the United States District Court for the District of Columbia to hear disputes.  ECF No. 2-1 ¶ 46.

> or to change the operating time(s) of any schedule even if such
> schedule(s) interline with the other Party.

ECF No. 2-1 (emphasis added).  Trailways contends that Greyhound's agreement to "continue interlining . . . for a minimum of two years after the termination" of the Revenue Pooling Agreement was a key part, and perhaps *the* key part, of the Settlement Agreement.  Eugene Berardi Decl. ¶¶ 32–39.  Greyhound concurs that paragraph 21 was an important part of the settlement, but focuses on the language discussing the parties' commitment to enter a written interline agreement in good faith as the crucial portion.  Greyhound Opp'n 8; Koch Decl. ¶ 13.

It is undisputed that the parties did not enter into a written interline agreement after signing the Settlement Agreement.  Greyhound blames radio silence and failures from Trailways.  Greyhound Opp'n 7–9.  Trailways blames Greyhound for offering bad terms and an attitude of disinterest, alongside disruptions from the COVID-19 pandemic.  Trailways Mot. 6–7; Trailways Reply 14–15.

### D.  Origins of the Parties' Current Dispute

Paragraph 21 became newly relevant after Greyhound was purchased by FlixMobility in 2021.  Eugene Berardi Decl. ¶¶ 42–43; Greyhound Opp'n 9.  While the Revenue Pooling Agreement was originally set to expire in 2027, it permitted early termination upon a change in control at Greyhound.  ECF No. 1-1 ¶ 19(c); Greyhound Opp'n 9; Eugene Berardi Decl. ¶ 43.  In late February 2022, the newly-acquired Greyhound notified Trailways that it would terminate the revenue pooling relationship on June 1, 2022.  Greyhound Opp'n 10; Eugene Berardi Decl. ¶ 43.  Greyhound also informed Trailways that it would cease interlining on June 1, 2022 "because it had failed to enter a written interline agreement, and, thus there was no interline agreement."

Eugene Berardi Decl. ¶ 44. On June 8, Greyhound officially ceased interlining with Trailways and stopped selling Trailways tickets. Greyhound Opp'n 11; Eugene Berardi Decl. ¶ 44.

On June 9, 2022, Trailways filed its motion for a TRO and preliminary injunction in this Court. ECF No. 6. The following day, and after a hearing on the motion, this Court entered a TRO in favor of Trailways. *See* ECF No. 9. Greyhound has subsequently filed its opposition and Trailways has filed a reply. The reserved motion for a preliminary injunction is accordingly ripe for review.

## II.    LEGAL STANDARDS

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* at 20. The movant must make a "clear showing that four factors, taken together, warrant relief." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)).[2]

This Court has previously considered whether a "sliding scale" applies to the four factors. *See United States v. Bolton*, 468 F. Supp. 3d 1, 4–5 (D.D.C. 2020). If adopted, the sliding scale analysis allows a Court to grant preliminary relief "with either a high likelihood of success and some injury, or vice versa." *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985). In *Winter*, however, the Supreme Court disturbed the foundations of a scaled approach and

---

[2] The Court uses the same factors when considering a TRO as it does for deciding whether to issue a preliminary injunction. *Nguyen v. U.S. Dep't of Homeland Sec.*, 460 F. Supp. 3d 27, 33 (D.D.C. 2020).

explained that a plaintiff must "demonstrate that irreparable injury is likely in the absence of an injunction" even if the likelihood of success is high. *See Winter*, 555 U.S. at 22–24. Accordingly, the Supreme Court has apparently rejected the proposition that a court can excuse the plaintiff's weakness on one factor due to her strength on another factor. *See Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring) ("It appears that a party moving for a preliminary injunction must meet four independent requirements."). The D.C. Circuit has not yet given definitive guidance on whether *Winter* "is properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned." *See Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018).

Absent further guidance, the Court will follow its conclusion in *Bolton* and require that "the [plaintiff] must clearly establish all four factors." *Bolton*, 468 F. Supp. 3d at 5; *see also Open Tech. Fund v. Pack*, 470 F. Supp. 3d 8, 16 n.6 (D.D.C. 2020) ("The D.C. Circuit has previously followed a 'sliding scale' approach to evaluating preliminary injunctions, but that approach is likely inconsistent with *Winter*.").

A plaintiff seeking a preliminary injunction may supply "evidence that is less complete than in a trial on the merits." *Workman v. Bissessar*, 275 F. Supp. 3d 263, 267 (D.D.C. 2017) (quoting *Natural Res. Def. Council v. Pena*, 147 F.3d 1012, 1023 (D.C. Cir. 1998)). "[N]evertheless [the plaintiff] bears the burden of producing credible evidence sufficient to demonstrate her entitlement to injunctive relief." *Id.* (citing *R.I.L–R v. Johnson*, 80 F. Supp. 3d 164, 173 (D.D.C. 2015)).

## III.    DISCUSSION

The Court will take the four factors of a preliminary injunction (likelihood of success on the merits, irreparable injury, balance of the equities, and public interest) one at a time. Trailways has shown a likelihood of success on the merits and that the balance of the equities favors it, but

has failed to establish irreparable injury and public interest.  Therefore, this Court will not issue an injunction.

### A. Trailways is Likely to Succeed on the Merits

To begin, Trailways is likely to succeed on the merits of its claim—the "most important factor" in a preliminary-injunction analysis.  *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014).  Both parties agree that Texas law governs this breach of contract claim.  Trailways Mot. 8 n.5; Greyhound Opp'n 18.  Trailways argues that Greyhound breached the Settlement Agreement by failing to "continue interlining . . . for a minimum of two years" after terminating the Revenue Pooling Agreement.  ECF No. 2-1 ¶ 21.

Greyhound responds with three arguments.  First, Greyhound argues that the phrase "continue interlining" is too indeterminate to be enforceable and that paragraph 21 is instead an unenforceable agreement to agree.  Greyhound Opp'n 18–23, 26–28.  Second, Greyhound argues that the agreement is unenforceable under Texas's Statute of Frauds.  *Id.* at 24–26.  Third, it argues that Trailways breached the agreement by failing to negotiate a written interline agreement.  *Id.* at 28–29.  The Court takes each of Greyhound's responses in turn.

### 1. Greyhound's Agreement to "Continue Interlining" is Likely Enforceable and Not Part of an Unenforceable Agreement to Agree

Greyhound first argues that the contract is unenforceable because the agreement to "continue interlining" is too indefinite.  Greyhound Opp'n 18–23, 26–28.  Under Texas law, a contract is not legally enforceable unless it "address[es] all of its essential and material terms with a reasonable degree of certainty and definiteness."  *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) (cleaned up).  In part, this flows from a basic rule of contract law: there must be a meeting of the minds for there to be a valid contract.  *Sacks v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) (per curiam); *see Baby Dolls Topless Saloons, Inc. v. Sotero*, 642 S.W.3d 583, 587 (Tex.

2022) (per curiam).  Thus, "a contract must at least be sufficiently definite to confirm that both parties actually intended to be contractually bound."  *Fischer*, 479 S.W.3d at 237.  Even beyond the parties' intent, the definiteness requirement is important to enable "a court to understand the parties' obligations, and[]give an appropriate remedy if they are breached."  *Id.* (cleaned up).

Under Texas law, a court "must construe the contract as a whole, and evaluate the overall agreement to determine what purposes the parties had in mind at the time they signed it."  *Id.* at 239 (cleaned up).  The goal of this exercise is to "[e]ffectuat[e] the parties' expressed intent." *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex. 2008).  Crucially, the focus is *not* on subjective intent.  "[O]bjective, not subjective, intent controls, so the focus is on the words the parties chose to memorialize their agreement."  *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 757–58, 764 (Tex. 2018).  Nevertheless, "words must be construed in the context in which they are used" including "the circumstances present when the contract was entered."  *Id.* at 764 (cleaned up).

First, because terms need only be definite if they are "material and essential" to the parties' contract, it is important to establish whether the continue interlining provision is a material and essential part of the Settlement Agreement.  *See Fischer*, 479 S.W.3d at 237.  This Court concludes that it is.  "Material and essential terms are those that the parties would consider 'vitally important ingredients' to their agreement."  *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 481 (Tex. 2019) (quoting *Fischer*, 479 S.W.3d at 237).  A court "must be mindful of the nature of the contract" when it considers whether provisions are material.  *Id.*  And the Texas Supreme Court has repeatedly explained that material and essential terms are "determined on a case-by-case basis."  *Id.*; *see T. T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221

(Tex. 1992). The Court will "evaluate the overall agreement" to determine its purpose. *See Fischer*, 479 S.W.3d at 239.

The Settlement Agreement explains that it exists to "resolve [the parties'] differences" that had arisen during their performance of the Revenue Pooling Agreement. ECF No. 2-1 ¶¶ A–H. Nearly all of the Settlement Agreement's provisions discuss the parties' future dealings with each other. *See, e.g.*, ECF No. 2-1 ¶¶ 5–9 (explaining how to divide future fees); *id.* ¶¶ 15–16 (dealing with branding obligations and restrictions); *id.* ¶¶ 17–18 (addressing division of pool-related costs); *id.* ¶¶ 27–30 (addressing operational issues). The Settlement Agreement thus expresses a purpose to resolve past disagreement and to delineate the bounds of the parties' relationship moving forward. This is the "nature of the contract" here. *See Barrow-Shaver*, 590 S.W.3d at 481.

With that expressed purpose in mind, the Court will next look to the context and circumstances surrounding the creation of the Settlement Agreement. *See URI*, 543 S.W.3d at 764. In the lead up to the Settlement Agreement, the parties' relationship had two components. The first was the pooling of routes. That portion of the relationship began with the service pooling agreement and was strengthened with the Revenue Pooling Agreement in 1997. Eugene Berardi Decl. ¶ 26. The second part was the industry-standard interlining relationship, that had existed for decades. Greyhound Opp'n 7–8; Eugene Berardi Decl. ¶ 19.

Paragraph 21 is crucial to the purpose of the Settlement Agreement—to resolve and define the parties' future relationship—because it specifies the extent and duration of the parties' interlining obligations. It resolves that, when the parties' pooling relationship is terminated, the interlining relationship must continue, and continue for at least two years. Without paragraph 21, the Settlement Agreement would be silent regarding the continuing obligations of the parties

towards a crucial part of their relationship. It is only with paragraph 21 that the Settlement Agreement defines the bounds of *both* the pooling and interlining components of the parties' commercial bond. Accordingly, the continuation-of-interlining provision is a vital ingredient and a material and essential part of the contract. *See Barrow-Shaver*, 590 S.W.3d 471 at 481.[3]

Next, the Court will address whether the continue interlining provision is sufficiently definite as to ensure that the parties "intended to be contractually bound." *See Fischer*, 479 S.W.3d at 237; Greyhound Opp'n 18–19. Greyhound argues that the parties "do not have an agreed understanding—either in writing or otherwise—about the terms of interlining after the termination of the pool." Greyhound Opp'n 18. It therefore asserts that there was no intent to contract. *Id.* at 19.

Greyhound's purported subjective intent, however, is no basis for evaluating whether the parties intended to be bound by this agreement. Instead, courts must consider the objective intent of the parties expressed through the language that they chose to put into their contract. *URI*, 543 S.W.3d at 757–58, 764. "Objective manifestations of intent control, not what one side or the other alleges they intended to say but did not." *Id.* at 763–64 (cleaned up). Furthermore, the language will be understood based on its "plain, ordinary, and generally accepted meaning" supplemented by objectively determinable context, such as "surrounding circumstances" "trade custom" and "trade usage." *Id.* at 758, 764–68 (cleaned up).

In addition to its command that a court objectively determine intent, Texas law disfavors construction of contractual terms in a manner that renders them invalidly indefinite. *Fischer*, 479 S.W.3d at 239; *see Sotero*, 642 S.W.3d at 587 (per curiam). When "[a] material term [] appears

---

[3] The parties have separately noted the importance of paragraph 21: Trailways emphasizes the importance of the two years of continued interlining, Eugene Berardi Decl. ¶¶ 32–39, while Greyhound emphasizes the agreement to negotiate new written interline terms in good faith, Koch Decl. ¶ 13.

to be indefinite or uncertain [it] may be supplemented or given further precision." *Barrow-Shaver*, 590 S.W.3d at 481 (citing *Fischer*, 479 S.W.3d at 239–40). "Expressions that at first appear incomplete or uncertain are often readily made clear and plain by the aid of common usage and reasonable implications of fact." *Fischer*, 479 S.W.3d at 239 (cleaned up). And terms "that 'appears to be indefinite may be given precision by usage of trade or by course of dealing between the parties.'" *Id.* (quoting Restatement (Second) of Contracts § 33 cmt. a (Am. L. Inst. 1981)).

When these rules are applied, the continuation-of-interlining provision here is sufficiently definite to evince an intent for the parties to be contractually bound. Both parties readily agree that interlining has a special meaning in the commercial realm of intercity bus transportation. Greyhound Opp'n 13, 23; Trailways Reply 4. Even if the word "interline" were used without any additional clarification, there would be a basis to conclude that it was sufficiently definite based on its standard usage in the intercity busing industry. *See Fischer*, 479 S.W.3d at 239. This conclusion is bolstered by materials submitted to this Court that show specific industry usage as well as practices of the parties. Trailways Reply 4–8, 11–13; ECF No. 20-3 (Interline Reclaim Procedures Manual by the National Bus Traffic Association); ECF No. 20-5 (Tariff Participation Agreements between Greyhound and Trailways); ECF No. 20-9 (Greyhound Passenger Fare Tariff and Sales Manual); *see also* ECF No. 2-1 ¶ 19 (referencing in the Settlement Agreement "the standard 20% NBTA [National Bus Traffic Association] rate" when calculating "Interline Adjustments" for "Pool to Non-Pool Interline Tickets").

But the term "interline" does not appear in the Settlement Agreement alone. The parties included further clarifying language, stating that Greyhound must "*continue* interlining." ECF No. 2-1 ¶ 21 (emphasis added). The use of the word continue is critical. To continue is to "keep up or maintain" or to "remain in existence." *Continue*, Webster's Third New Int'l Dictionary 492 (1965);

*see also Continue*, Merriam–Webster Dictionary Online, http://www.merriamwebster.com/dictionary/continue (last visited June 22, 2022) (defining continue as "to maintain without interruption a condition, course, or action," "to remain in existence," "to remain in a place or condition," and "to resume an activity after interruption."). The definitions of continue presuppose the original existence of something, like a course or action, that is then maintained or resumed. In the context of the Settlement Agreement, the natural, logical, and definite meaning of "continue interlining" is a reference back to the parties' pre-existing practice of interlining and the maintenance of that practice for at least two years after the end of revenue pooling. The parties did not merely reference general trade usage, but instead committed to keeping their own course of practice.

This reading is bolstered by the preceding sentence, which states that "[t]he parties agree to work together in good faith towards completing the negotiations and entering into a *new interline agreement* within two months following the execution date of this Agreement." ECF No. 2-1 ¶ 21 (emphasis added). A *new* interline agreement presupposes some form of prior agreement; for these parties, it references the prior interlining practice decades in the making. And while "[t]he Parties acknowledge that there is no current written interline agreement" in paragraph 21, that statement does not contradict the Court's conclusion. The parties have not had a written interline agreement, but they certainly have had an interline practice which continued until June 8, 2022—when Greyhound terminated it. Greyhound Opp'n 11. The parties incorporated that practice into the Settlement Agreement, under which Greyhound is obligated to continue interlining for two years.[4]

---

[4] The parties further expressed this expectation through the language in paragraph 22 of the Settlement Agreement. Directly after the continue interlining provision, the parties caution that "[n]othing herein shall affect either Party's right to determine, in its sole discretion but in good faith, to stop operating any schedule or to change the operating

Greyhound is consequently wrong when it asserts that there was no meeting of the minds and thus no breach of contract. Interlining is well defined in this context. The objectively expressed intent of the parties, as understood through the language adopted for their contract and the surrounding context, is to bind Greyhound to maintain the parties' interline practice for two years. *See URI*, 543 S.W.3d at 757–58.

Greyhound's further argument—that because the parties have argued in the past, and to this Court, about the contours of the interlining arrangement, the agreement is too indefinite—fails. Greyhound Opp'n 23. It is true that definiteness of a contract is also important, beyond a meeting of the minds, so that a court can understand the parties' obligations and determine whether a breach has occurred. *Fischer*, 479 S.W.3d at 237. However, "if the parties clearly intended to agree and a 'reasonably certain basis for granting a remedy' exists, [a court should] find the contract terms definite enough to provide that remedy." *Id.* at 239 (citing Restatement (Second) of Contracts § 33 cmt. b (Am. L. Inst. 1981)).

As the Court has explained, the continuation-of-interlining provision here expresses an intent for Greyhound to adopt and commit to the parties' longstanding interlining practice when their pooling relationship ended. Thus, all the essential terms are provided. *See id.* at 237. The subject matter of interlining is clearly identified. The parties state that the arrangement will last two years. And the parties incorporate their prior interlining practice. Therefore, by examining the parties' past practice in the context of the industry standard of interlining, this Court has a

_____

time(s) of any schedule even if such schedule(s) interline with the other Party." ECF No. 2-1 ¶ 22. Such a carve out would be unnecessary unless the parties intended for the Settlement Agreement to otherwise bind the parties to maintain their interlining relationship. Otherwise, the parties would be under no obligation to maintain a schedule that also has an interline with the other. Paragraph 22 thus provides further evidence that paragraph 21 represents the parties' definite intention to continue the existing interline practice.

reasonable basis to ascertain whether the agreement has been violated and when a remedy is warranted. *See id.* at 239.

This conclusion is not altered by Greyhound's contention that paragraphs 21 and 22, read as a whole, render the standalone sentence requiring two years of continued interlining part of a broader agreement to agree. Greyhound Opp'n 26–28. Agreements to agree are unenforceable under Texas law unless all material and essential terms are specified. *Fischer*, 479 S.W.3d at 242. But "[while] an agreement to agree that does not sufficiently describe its material terms is unenforceable, the parties may reach other related agreements that are sufficiently definite and enforceable." *Id.* at 238 n.6. As the Texas Supreme Court has explained:

> Two persons may fully agree upon the terms of a contract, knowing that there are other matters on which they have not agreed and on which they expect further negotiation. Such an expectation does not prevent the agreement already made from being an enforceable agreement. This may be true even though they expressly provide in their agreement that the new matters, when agreed upon shall be incorporated into a written lease or other formal document along with the contract already made.

*Scott v. Ingle Bros. Pac.*, 489 S.W.2d 554, 556 (Tex. 1972) (cleaned up). It is true that the parties agreed to negotiate "a new interline agreement," just as Greyhound had done with other regional bus companies. ECF No. 2-1 ¶ 21. Yet, the parties had been interlining without such an additional agreement for many decades. Eugene Berardi Decl. ¶ 19. The wording of Trailways's favored sentence is stark: "Greyhound shall continue interlining with Adirondack for a minimum of two years after the termination of the Pool." ECF No. 2-1 ¶ 21. It is a standalone command; it is a plain directive to Greyhound. The remainder of paragraph 21 directs the parties to take the next step and develop a written interline agreement. However, as the *Scott* Court explained, "an expectation does not prevent the agreement already made from being an enforceable agreement." *Scott*, 489 S.W.2d at 556. The term requiring Greyhound to continue interlining with Trailways

is separate from the parties' additional agreement to agree to new terms in the future conceptually, textually, and legally.  *See id.*; *Fischer*, 479 S.W.3d at 238 & n.6.

Greyhound's wish for and expectation of a set of comprehensive written interline terms is understandable.  For years, Greyhound had wanted to introduce new written terms for its interline relationship with Trailways.  Greyhound Opp'n 8.  When that desire led nowhere, it signed a Settlement Agreement with Trailways containing an agreement to arrive, in good faith, at a future interline agreement that would encompass at least some of its desires.  *See id.*; Koch Decl. ¶ 13. But, in the meantime, the Settlement Agreement committed Greyhound to maintaining the terms of its longstanding interlining practice with Trailways until two years after the end of their pooling relationship.  ECF No. 2-1.  Trailways is likely to succeed in showing that the parties' agreement is sufficiently definite as to be enforceable.

### 2.    The Interlining Provision Likely Does Not Violate the Statute of Frauds

Greyhound raises Texas's Statute of Frauds, an affirmative defense, to argue that the interlining provision here is invalid.  Tex. Bus. & Com. Code § 26.01(b).  Both parties agree that the Statute of Frauds applies here.  Greyhound Opp'n 25; Trailways Reply 8; *Niday v. Niday*, 643 S.W.2d 919, 920 (Tex. 1982) (per curiam).  Thus, the only question is whether the Statute of Frauds has been satisfied.

In order to satisfy Texas's Statute of Frauds, "a promise may be evidenced by a 'memorandum of' the promise that is (1) in writing and (2) signed by the party to be charged with the promise."  *Bocchi Americas Assocs. Inc v. Com. Fresh Mktg. Inc.*, 515 F.3d 383, 391 (5th Cir. 2008) (quoting Tex. Bus. & Com. Code § 26.01(1)).  Furthermore, "there must be a written memorandum which is complete within itself in every material detail, and which contains all of the essential elements of the agreement, so that the contract can be ascertained from the writings

without resorting to oral testimony." *Padilla v. LaFrance*, 907 S.W.2d 454, 460 (Tex. 1995) (quoting *Cohen v. McCutchin*, 565 S.W.2d 230, 232 (Tex. 1978)). This memorandum can be contained across multiple writings. *Id.*

The agreement here satisfies the Statute of Frauds. First, the Settlement Agreement and, to the extent relevant, the Revenue Pooling Agreement are both in writing. ECF No. 1-1; ECF No. 2-1. Both are signed by Greyhound and Trailways. ECF No. 1-1; ECF No. 2-1. Second, the written memorandum is sufficiently complete. Greyhound argues that even if the parties agreed that they would continue interlining, they did not "reduc[e] those material terms to writing." Greyhound Opp'n 26. That belief, however, is not quite right. The parties' agreement to maintain their interlining practice, "continue interlining," along with the duration of that agreement, two years, provides all the essential terms required. ECF No. 2-1. The provision is sufficiently definite. *See supra* Part III.A.1. And the agreement lies entirely within the signed writing agreed to by both parties. No oral testimony or other recollections are required to ascertain that Greyhound has, indeed, committed to maintenance of the interlining practice of the parties and that it has done so for a two-year term. *See* ECF No. 2-1. Nothing further is required to evidence the essential elements of the agreement.

For further clarity, consider the Texas Supreme Court's rules with regards to the Statute of Frauds for real property. There, the Statute of Frauds is satisfied as to the essential term of description of property when the contract or another referenced writing provides "the means or data by which the [property] to be conveyed may be identified with reasonable certainty." *Long Trusts v. Griffin*, 222 S.W.3d 412, 416 (Tex. 2006) (cleaned up). "Extrinsic evidence may be used only for the purpose of identifying the [property] with reasonable certainty from the data contained in the contract." *Id.* (cleaned up); *see also Texas Builders v. Keller*, 928 S.W.2d 479, 481–82 (Tex.

1996) (per curiam) ("For example, a contract that provides for sale of 'my ranch of 2200 acres' is sufficient, where extrinsic evidence shows that the grantor owned one ranch, which indeed contained 2200 acres.").

The agreement to continue interlining contains the same kinds of "means or data" sufficient in the real estate context. It shows that Greyhound has agreed to maintain the interline practice previously developed. Extrinsic evidence is only used to identify the precise nature of the practice, but the actual agreement is set with certainty. *See* Restatement (Second) of Contracts § 131 cmt. g (Am. L. Inst. 1981) ("The 'essential' terms of unperformed promises must be stated; 'details or particulars' need not."); *see also Botello v. Misener-Collins Co.*, 469 S.W.2d 793, 794 (Tex. 1971) (explaining that certain terms need not be in the writing, including details like "terms of payment").

Therefore, Trailways has shown that the Settlement Agreement likely satisfies the Statute of Frauds.

### 3.    Trailways Has Likely Not Breached its Obligations

Greyhound argues that Trailways breached its agreement "to work together [with Greyhound] in good faith towards completing the negotiations and entering into a new interline agreement." ECF No. 2-1; *see* Greyhound Opp'n 28. Yet, Greyhound also concedes that such an agreement to agree is unenforceable under Texas law. *See* Greyhound Opp'n 27; *Fischer*, 479 S.W.3d at 238 n.6. As this Court has explained, the parties here "fully agree[d] upon the terms of a contract" but then provided for future negotiations which "when agreed upon [would] be incorporated into a written lease or other formal document along with the contract already made." *See Scott*, 489 S.W.2d at 556. The definite agreement that the parties reached is enforceable; the

agreement to agree is not.  So, Trailways could not have breached its obligations under the latter and Greyhound remains obligated under the former.[5]

*     *     *

This Court need not decide the precise obligations that Greyhound has under its agreement to continue interlining for two years at this juncture.  By Greyhound's own account, it has ceased all interlining with Trailways in any form.  Greyhound Opp'n 11; Koch Decl. ¶ 18.  Thus, under any definition, including Greyhound's own, Trailways has established that it is likely to succeed on the merits of its breach of contract claim.[6]  And because the Court concludes on other grounds that a preliminary injunction is not warranted, it will withhold a decision on the matter until the parties have had an opportunity to fully and comprehensively brief the issue outside the circumscribed bounds of this emergency motion.

In sum: Trailways is likely to succeed on the merits of its breach of contract claim.  The first factor favors Trailways.

### B.  Trailways Has Not Demonstrated a Likelihood of Irreparable Injury

To demonstrate that irreparable injury is "likely," *Winter*, 555 U.S. at 20, 22, Trailways must satisfy two prongs.  "First, the harm must be certain and great, actual and not theoretical, and so imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm. Second, the harm must be beyond remediation." *Newby*, 838 F.3d at 7–8 (cleaned up).  In short,

---

[5] The Settlement Agreement's severability clause furthers this conclusion.  ECF No. 2-1 ¶ 44.

[6] Outside of Greyhound's noted and resolved objections, there appears to be no dispute that the contract is otherwise valid.  "Under Texas law, a binding contract requires (1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with intent that it be mutual and binding." *Coffel v. Stryker Corp.*, 284 F.3d 625, 640 n. 17 (5th Cir. 2002) (cleaned up).  While there is little discussion in the parties' briefing of the question, it is likely that Trailways will satisfy the remaining elements of breach of contract.  Other than existence of a valid contract, the remaining elements are "the plaintiff performed or tendered performance, [] the defendant breached the contract, and [] the plaintiff suffered damages as a result of defendant's breach." *Parker Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 72 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).

20

plaintiff must establish immediacy and severity of harm, followed by whether that harm could be later remediated. To meet this requirement, Trailways points to two harms: monetary and reputational. Neither satisfies the "high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

### 1.    Trailways Has Not Established Irreparable Monetary Harm

Neither party disputes that, on June 8, 2022, Greyhound stopped interlining with Trailways. Eugene Berardi Decl. ¶ 44; Greyhound Opp'n 11; Koch Decl. ¶ 18. Accordingly, Greyhound stopped the sales of all interline tickets that included a Trailways leg. Eugene Berardi Decl. ¶ 44. Trailways's Chief Executive Officer ("CEO") explains that Trailways will suffer "significant harm" because "a large proportion" of its passengers traveled via interline ticket on routes that were traditionally pooled; and Greyhound had ceased selling interline tickets for routes including Trailways.[7] *Id.* ¶¶ 46–48. Trailways's CEO further explains that he believes the amount of monetary harm would be immeasurable, but puts an "estimate" at "several hundred thousands of dollars a month." *Id.*; *see also* Eugene Berardi Second Decl. ¶¶ 3–4; Alexander Berardi Decl. ¶ 29, ECF No. 20-2. This is a credible claim for significant monetary harm. Furthermore, that asserted harm is certain and actual because Greyhound followed through on its promise to cease selling interline tickets that include Trailways. Indeed, the only reason that Greyhound is selling

---

[7] This Court assumes, for purposes of analyzing irreparable injury, that Greyhound would be required to accept plaintiff's definition of interlining. Even under that most burdensome possible standard, with the highest calculation of harm, Trailways does not meet the irreparable injury requirement.

those same tickets today is because of this Court's TRO.  Therefore, Trailways has shown that its monetary harm is both significant and imminent.[8]

Nevertheless, Trailways has failed to establish that its monetary harm is beyond remediation.  It is not enough that "money, time and energy" will "necessarily [be] expended." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297–98.  Regardless of how "substantial" monetary harm might be, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Id.*  It is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).  After all, such harm can be later remediated through subsequent litigation.  *See Chaplaincy of Full Gospel Churches*, 454 F.3d at 297–98.

Nevertheless, there are exceptions: irreparable harm may lie in situations where (1) the threatened action by defendant will create harms that will be so speculative as to bar recovery at a subsequent trial for money damages or (2) "the very viability of the plaintiff's business" is at stake. *See Tom Doherty Associates, Inc. v. Saban Enter.*, 60 F.3d 27, 38 (2d Cir. 1995); *Wisconsin Gas*, 758 F.2d at 674 (per curiam) ("Recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business."); *Central United Life, Inc. v. Burwell*, 128 F. Supp. 3d 321, 329 (D.D.C. 2015), *aff'd sub nom. Central United Life Ins. Co. v. Burwell*, 827 F.3d 70 (D.C. Cir. 2016).

---

[8] Greyhound points to Trailways's press release which includes statements to the public that suggest Trailways's harms are less dire than it represents to the Court.  Greyhound Opp'n 23 & n. 15, 30; ECF No. 19-7.  The Court acknowledges the differences and considers some of the pertinent information regarding Trailways's operations.  Nevertheless, at this juncture, the Court is satisfied that the press release is likely largely necessary public relations management and not an accurate characterization of the challenges the firm faces due to the end of pooling and interlining with Greyhound.

For speculative harms, Trailways argues that its "harms will be difficult, if not impossible, to measure."  Trailways Mot. 11.  But its CEO estimated "several hundred thousands of dollars a month" of monetary harm would flow from the loss of interlining.  Eugene Berardi Decl. ¶ 48.  Trailways's CEO also swears that Greyhound has "detailed information showing how many passengers and how much revenue would be diverted from Trailways to Greyhound," *id.*, providing a clear avenue to measure harms.  This is bolstered by the calculations Greyhound submitted in this case of Trailways tickets sold on its platform in the period since the TRO issued.  Koch Decl. ¶ 26.  There is strong evidence that monetary harms flowing from Greyhound's actions are readily measurable and correctable through a traditional breach of contract action seeking damages, rather than being so speculative as to bar recovery.

As for viability and survival, Trailways does assert that the interline provision was obtained to ensure its survival "as an independent bus company" twice in the introduction to its memorandum, Trailways Mot. 1–2, and once in the conclusion to its CEO's declaration, Eugene Berardi Decl. ¶ 54.  And it briefly states in its initial motion that "[t]he agreement to continue interlining for two years after the Pool ends is vital to Trailways's existence as it transitions its business away from the Pool."  Trailways Mot. 11.  Its CEO similarly swears that "[w]ithout the passengers and revenues from interlining with Greyhound, the continued existence of Trailways as an independent bus company after the Pool will be threatened."  Eugene Berardi Decl. ¶ 41.  As evidence, Trailways explains that "Greyhound sold about 80% of the Pool tickets, but it keeps only 57% of the Pool revenues and Trailways receives the remaining 43%."  Trailways Reply 16.  Accordingly, without the interlining agreement "Trailways would have a source for only 20% of the pre-Pool revenue but needs 47%."  *Id.*; *see also* Eugene Berardi Second Decl. ¶¶ 3–4;

Alexander Berardi Decl. ¶ 29 ("We are not selling enough tickets on our web site alone to break even.").

However, Trailways provides little context for how these numbers fit within its broader business operations. *See Am. Ass'n for Homecare v. Leavitt*, No. 1:08-cv-0992 (RMU), 2008 WL 2580217, at *4–5 (D.D.C. June 30, 2008) (discounting predictions unmoored from credible evidence as to magnitude of losses within the broader scheme of the movant's business activities). Even with these additional numbers and attestations by Trailways executives, the evidence produced by Trailways fails to credibly establish they Greyhound's actions have generated a viability-threatening injury. Trailways has failed to transform its recoverable economic injury for breach of contract into one beyond remediation. *See Newby*, 838 F.3d at 7–8; *Wisconsin Gas*, 758 F.2d at 674 (per curiam).

### 2.    Trailways Has Not Established Irreparable Reputation Harm

Trailways's proffered reputational harm also fails. While Trailways is correct that reputational injury can satisfy the irreparable injury standard, Trailways Mot. 12–13, its reputational harm claims are amorphous to the point of being insufficient to establish imminence and severity.

In its original motion, Trailways asserts reputational damage from its network being limited to New York State—"[c]ustomers will perceive Trailways as a bus company that can serve only local destinations in New York." *Id.* Yet, as Trailways noted in its press release, it is "an interline partner with Amtrak, and member of the National Trailways Bus Network" and is broadly "able to connect millions of passengers to thousands of destinations throughout North America each year." ECF No. 19-7. That general statement is given more heft because this Court has been convinced interlining is a standard practice in the industry. And while the original plan to

disconnect Trailways from interlining with Greyhound would have rendered interlining with other bus companies technically impossible, the parties have fixed that issue.  Greyhound Opp'n 10–11; Alexander Berardi Decl. ¶¶ 17–18.

Trailways attests that the system it is using still has difficulty interlining with other companies—that it can currently only do so with "one or two other carriers," Alexander Berardi Decl. ¶¶ 17–18.  Nevertheless, the connection to Trailways' reputation here is too attenuated.  The link between Greyhound's interlining decision, the system Trailways is now using, the difficulties interlining with other partners, and the effect that all of this will have on the public's perception of Trailways's broader ability to serve non-New York destinations is insufficiently severe or immediate to warrant injunctive intervention.  *See Newby*, 838 F.3d at 7–8; *John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1134 (D.C. Cir. 2017) (discounting "speculation about how third parties might respond to [the subject of the injunction.]").

In its reply, Trailways states that it will suffer further reputational harm because "customers who have been accustomed to going to Greyhound's website for all of these years will no longer be able to get tickets for service on Trailways."  Trailways Reply 17.  While that may be true, Trailways provides no credible evidence as to how this problem could cause severe and imminent reputational harm separate from the general monetary harms derived from Greyhound's refusal to sell Trailways interline tickets.  Trailways's purported reputational harms are insufficient for irreparable injury.

Because Trailways has failed to demonstrate irreparable injury, a preliminary injunction will not issue.  *See Winter*, 555 U.S. at 22–24; *Bolton*, 468 F. Supp. 3d at 7.  Nevertheless, the Court will briefly consider the final two factors of a preliminary injunction for completeness.

### C.  The Balance of the Equities Favors Trailways

When a court balances the equities, it "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (cleaned up). The balance is unfavorable to an injunction when "while preventing harm to one party, [it] causes injury to the other," however, "preserv[ation] of the relative positions of the parties until a trial on the merits can be held" favors an injunction. *NAACP v. U.S. Postal Serv.*, 496 F. Supp. 3d 1, 19–20 (D.D.C. 2020) (cleaned up). The circumstances here render this factor a close call, ultimately favoring Trailways.

As this Court has already explained, Trailways faces credible economic harms from Greyhound's decision to abolish the parties' interline relationship (even though it has not established that those harms are viability-threatening). And Trailways has made a clear showing that it is likely to succeed on the merits of a future breach of contract claim against Greyhound for this choice.

But the record also shows that if this Court issues an injunction requiring interlining between the parties, such a relationship would be one sided. At the moment, Greyhound can sell interline tickets for Trailways, but not vice versa. Greyhound Opp'n 11, 32; Trailways Reply 18; ECF No. 19-12. Trailways, for its part, blames Greyhound—explaining that Trailways needed to quickly launch its ticketing platform without full interline functionality precisely because of Greyhound's alleged breach and Greyhound's statement that it would not continue interlining with Trailways. Trailways Reply 19. And the creation, development, and implementation of Trailways's ticketing system appears to be linked to Greyhound and based on demands from Greyhound prior to its acquisition by FlixMobility. Alexander Berardi Decl. ¶¶ 8–14.

Given the origins of Trailways's difficulty interlining with Greyhound, as well as the credible economic harm, the balance of the equities favors Trailways.[9]  *Cf. Delta Sigma Theta Sorority, Inc. v. Allen Pro. Graphics Grp.*, LLC, 212 F. Supp. 3d 116, 120 (D.D.C. 2014) (recognizing that a defendant's knowing and profit-driven violation of law forecloses success on the balance of the equities analysis).

### D.  Trailways Has Not Shown that the Public Interest Favors an Injunction

As for the public interest, given that the "injury [is] purely economic, [t]he public interest factor is a wash."  *See Davis*, 571 F.3d at 1295 (cleaned up).  Trailways argues that the public interest factor is satisfied by "ensuring that contracts impacting public transportation are enforced in a fair and legal fashion" as well as "the travelling public's ability to conveniently purchase interlining Trailways tickets from Greyhound."  Trailways Reply 20–21; Trailways Mot. 14.  If the record indicated that crowds of sweaty passengers had been thrown under the bus by Greyhound's conduct, Trailways might very well have established a public interest in issuing a preliminary injunction.  However, such evidence has not surfaced.  Instead, Trailways is offering services on its website that the public can seek out if Greyhound's services are insufficiently convenient.  *See* Greyhound Opp'n 23 n.15, 30; ECF No. 19-7; ECF No. 19-16.

Trailways also argues that "the public interest is served by preserving Trailways as a vibrant competitor in the marketplace."  Trailways Reply 21.  This cannot carry the public interest factor across the finish line because Trailways has failed to credibly establish that the viability of its business is at stake.  *See supra* Part III.B.1.

---

[9] Greyhound's other argument, that it will be harmed by being forced to sell interline tickets and compete with Trailways at the same time, is without merit.  *See* Greyhound Opp'n 32.  It is merely a rehash of whether Greyhound has breached a contractual obligation to continue interlining, which this Court has concluded it likely has.  *Supra* Part III.A.

All that leaves Trailways with is remediable economic harm stemming from an anticipated breach of contract.  This is insufficient to establish that the public interest factor favors a preliminary injunction.

*     *     *

Trailways has failed to establish the factors of irreparable harm and public interest. Therefore, Trailways has not made a clear showing that injunctive relief is warranted.

## IV.    CONCLUSION

Based on the reasoning above, the Court will **DENY** Trailways's motion for a preliminary injunction.  A separate order consistent with this memorandum opinion shall issue this date.

Date: July 1, 2022

/s/
_____
Royce C. Lamberth
United States District Judge