## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ADIRONDACK TRANSIT LINES, INC.,** *et al.*,<br><br>　　　　*Plaintiffs,*<br><br>**v.**<br><br>**GREYHOUND LINES, INC.,**<br><br>　　　　*Defendant.* | **Case No. 1:22-cv-1662-RCL** |

## <u>MEMORANDUM OPINION</u>

This opinion considers whether a party may pursue an unjust-enrichment claim based on an allegedly improper temporary restraining order ("TRO") and when a company may sue a competitor for attempting to poach employees and customers. These issues are raised by plaintiffs' (collectively known as "Trailways") motion to dismiss counterclaims by defendant ("Greyhound") The parties first appeared in front of this Court when it issued a TRO requiring Greyhound to "continue interlining" with Trailways pursuant to a prior contract between the parties. ECF No. 9. Interlining, a common practice in the realm of intercity busing, allows customers to purchase a ticket with one bus company to travel with another bus company, although these parties dispute the finer details of the practice. *Adirondack Transit Lines, Inc. v. Greyhound Lines, Inc.*, No. 1:22-cv-1662 (RCL), 2022 WL 2452597, at *1–3 (D.D.C. July 1, 2022), ECF No. 22. After this Court denied a motion for preliminary injunction and allowed the TRO to expire, Greyhound filed counterclaims against Trailways. The counterclaims include counts for tortious interference, unfair competition, unjust enrichment, and restitution. Trailways then moved to dismiss all counts.

After reviewing the counterclaims, applicable law, and parties' briefing, the Court will **GRANT IN PART AND DENY IN PART** Trailways's motion to dismiss.

## I.    BACKGROUND

The Court has previously discussed at length the relationship between these parties and the procedural history of this lawsuit up to the point that the Court denied Trailways a preliminary injunction. *See id.* at *1–4. Therefore, a succinct summary of that background will suffice before the Court describes recent developments.

### A.  The Parties' Pre-Litigation Relationship

"Since at least 1988, Greyhound and Trailways have engaged in a common industry practice known as 'interlining.'" *See id.* at *1. Nine years into that interlining relationship, Trailways and Greyhound signed a Revenue Pooling Agreement under which Trailways and Greyhound agreed to pool revenue. *Id.* at *2–3; Countercls. ¶ 6, ECF No. 33 at 8–16. Under that agreement, Trailways "was given access to and information about Greyhound's employees that it would not have otherwise had." Countercls. ¶ 6. In February of 2022, Greyhound notified Trailways that Greyhound would be terminating the Revenue Pooling Agreement as of June 1, 2022. *Id.* at ¶ 7. Furthermore, "Greyhound also informed Trailways that it would cease interlining on June 1, 2022 because it had failed to enter a written interline agreement, and, thus there was no interline agreement." *Adirondack Transit Lines, Inc.*, 2022 WL 2452597 at *3 (internal quotation marks and citation omitted). On June 8, 2022, Greyhound ceased interlining with Trailways. *Id.*

### B.  Issuance of the TRO and Denial of a Preliminary Injunction

On June 9, 2022, Trailways moved for a TRO and preliminary injunction requiring Greyhound to continue interlining with Trailways under a breach of contract theory. *Id.* at *1, *4. Following a hearing, the Court granted Trailways's motion and issued a fourteen-day TRO, effective June 10, 2022, while reserving the motion for a preliminary injunction pending further briefing from both parties. *Id.*; ECF No. 9. The TRO ordered Greyhound to "continue interlining"

with Trailways.  Countercls. ¶ 22; ECF No. 9.  The Court subsequently extended the TRO for an additional fourteen days.  ECF No. 21.

 "To comply with the Temporary Restraining Order, Greyhound was forced to offer for sale to its customers trips on [Trailways] buses on competing routes that are served by Greyhound." Countercls. ¶ 23.  "Rather than have its customers ride on a Greyhound bus and generate that revenue for Greyhound . . . the revenue went to [Trailways]."  *Id.*

On July 1, 2022, the Court issued an order denying the motion for a preliminary injunction. *Adirondack Transit Lines, Inc.*, 2022 WL 2452597; ECF No. 23.  The Court held that Greyhound had demonstrated likelihood of success on the merits and that the balance of the equities favored an injunction, but that the other two preliminary injunction factors—irreparable injury to the plaintiff and the public interest—did not favor issuance.  *Adirondack Transit Lines, Inc.*, 2022 WL 2452597 at *15.  The TRO subsequently expired on its own terms.  ECF No. 23. ("[T]he Temporary Restraining Order . . . will expire on July 8, 2022 at 5:15pm.").

### C.  Greyhound's Counterclaims and Trailways's Motion to Dismiss

At the end of July, Greyhound filed counterclaims against Trailways alongside its answer to the complaint.  ECF No. 33.  Greyhound asserts counterclaims for (1) unfair competition; (2) tortious interference; (3) unjust enrichment; and (4) restitution.  Countercls. ¶¶ 26–44.

For factual support, Greyhound alleges that Trailways took a variety of actions that give rise to liability.  Broadly, it alleges that Trailways "has made a concerted effort to poach employees from Greyhound and steal Greyhound's customers through a host of improper and illegal means." *Id.* at ¶ 8.  Those allegations are detailed as follows.

For employees, Greyhound alleges that Trailways "using the knowledge it has obtained about the location and employment terms for Greyhound's employees, has approached numerous

Greyhound employees and attempted to convince them to leave Greyhound for employment with [Trailways]." *Id.* at ¶ 9.  Greyhound also alleges that Trailways's "representatives have conveyed to Greyhound's employees that because of the Pooling relationship, they have a unique insight into Greyhound's business and operations . . . representatives then seek to scare the Greyhound employees by lying . . . [and stating that] Greyhound intends to close certain locations and end certain routes in upstate New York." *Id.* at ¶ 10.  Greyhound also alleges that Trailways "knows that under its union contract it cannot offer seniority to a new driver that it has hired away from Greyhound . . . [but] representatives lie and instead state that they are 'looking into a way' to transfer seniority." *Id.* at ¶ 11.  "Since the beginning of 2022, multiple employees have left Greyhound and are now employed by [Trailways]." *Id.* at ¶ 13.

For customers, Greyhound leased space to Trailways in the Albany, NY bus terminal through a lease that "expired on June 1, 2022." *Id.* at ¶¶ 15–16.  As of the time of the counterclaims, "Greyhound has instituted an eviction proceeding in the Albany City Court, but that matter is not scheduled to be heard until August 26, 2022." *Id.* at ¶¶ 17–18.  While holding over, Trailways "employees use the intercom system to make statements about Greyhound that they know are false . . . [such as] to falsely announce that Greyhound does not offer refunds to customers." *Id.* at ¶ 20.  Trailways "representatives also use the intercom system at the Greyhound Albany Terminal to announce that they are offering a discount, upwards of 50%, to any Greyhound ticketed customer who cancels their Greyhound ticket and instead books a trip [with Trailways]." *Id.* at ¶ 21.  Trailways seeks damages resulting from the "loss from customers that were encouraged by [Trailways] to cancel their Greyhound tickets." *Id.* at ¶ 34.

On August 26, 2022, Trailways moved to dismiss Greyhound's counterclaims.  Pls.' Mot., ECF No. 37 at 1–2; Pls.' Mem. in Supp. ("Trailways's Mem."), ECF No. 37 at 3–29.  Greyhound

opposed.  Greyhound's Opp'n, ECF No. 40.  Trailways replied.  Trailways's Reply, ECF No. 42. The motion is now ripe for this Court's review.

## II.      LEGAL STANDARD

### A.  Motion to Dismiss for Failure to State a Claim

When a plaintiff moves to dismiss a defendant's counterclaims for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the Court applies the same standards that it does when evaluating a motion to dismiss a plaintiff's complaint on the same grounds.  *Wharf, Inc. v. D.C.*, 232 F. Supp. 3d 9, 16 (D.D.C. 2017).

"To survive a motion to dismiss [under Rule 12(b)(6)], a [counterclaim] must contain sufficient factual matter . . .  'to state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[W]hen reviewing the sufficiency of a complaint, a court must first 'tak[e] note of the elements a plaintiff must plead to state [the] claim' to relief, and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face.'"  *Blue v. D.C.*, 811 F.3d 14, 20 (D.C. Cir. 2015) (alterations in the original) (quoting *Iqbal*, 556 U.S. at 675, 678).   This requires an element-by-element consideration of each counterclaim.  *See id.*

"Though a [counterclaim] is not required to contain 'detailed factual allegations,' it must present more than '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'"  *Swecker v. FERC*, No. 1:21-cv-1590 (RCL), 2022 WL 4534944, at *3 (D.D.C. Sept. 28, 2022) (quoting *Iqbal*, 556 U.S. at 678).  A Court shall "accept as true all of the factual allegations contained in the [counterclaim]," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), though it need not accept "a legal conclusion couched as a factual allegation," *Iqbal*, 556 U.S. at 678.  The pleading shall be construed liberally and the party opposing the motion to dismiss

shall receive "the benefit of all inferences that can be derived from the facts alleged." *Zukerman v. United States Postal Serv.*, 961 F.3d 431, 436 (D.C. Cir. 2020) (quoting *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004)).

Furthermore, "[i]n determining whether to dismiss a claim under Rule 12(b)(6), the Court is able to only consider the facts alleged in the [counterclaim], documents attached as exhibits or incorporated by reference . . . and matters about which the Court may take judicial notice." *Gray v. Universal Serv. Admin. Co.*, 581 F. Supp. 2d 47, 51 (D.D.C. 2008) (internal quotation marks and citation omitted). The Court has accordingly not relied on factual allegations or exhibits, introduced in briefing, but not present in the counterclaims. Trailways's information about Greyhound ticket refundability, for example, is not incorporated by reference in the counterclaims and has not been considered. *See* ECF No. 37-1.

### III.   DISCUSSION

Greyhound asserts four counts against Trailways: (1) unfair competition; (2) tortious interference; (3) unjust enrichment; and (4) restitution. The first two are based on Trailways's conduct toward Greyhound employees and customers. The latter two are based on the theory that the TRO issued by this Court was in error and, therefore, Greyhound should receive restitution for the benefit conferred on Trailways. The Court will start by evaluating each of the first two counts separately. It will then consider Greyhound's TRO theory, and the two counts that might support it, together.

As a threshold matter, the parties agree that New York substantive law applies to all the counterclaims. Trailways's Mem. 7; Greyhound's Opp'n 4. This Court agrees.[1]

---

[1] The Court applies the choice-of-law rules of the District of Columbia for substantive law while employing federal procedural law. *Bain v. Gary, Williams, Parenti, Watson & Gary, P.L.*, --- F.Supp.3d ---, 2022 WL 10460373, at *5 (D.D.C. Oct. 18, 2022). "[T]he District of Columbia employs a constructive blending of the governmental interest

**A.  Greyhound Does Not Plausibly State a Claim for Unfair Competition by Trailways**

Of the two kinds of common-law unfair competition theories that are permissible under New York law, Greyhound relies on only one: "misappropriation."  Greyhound's Opp'n 8–10; *see ITC Ltd. v. Punchgini, Inc.*, 880 N.E.2d 852, 858 (N.Y. 2007).  "Under the misappropriation theory of unfair competition, a party is liable if they unfairly exploit the skill, expenditures and labors of a competitor."  *E.J. Brooks Co. v. Cambridge Sec. Seals*, 105 N.E.3d 301, 308 (N.Y. 2018) (internal quotation marks and citations omitted).  That includes "confidential competitive information."  *Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.*, 6 N.Y.S.3d 7, 13 (N.Y. App. Div. 2015).  "The essence of the misappropriation theory is not just that the defendant has 'reap[ed] where it has not sown,' but that it has done so in an unethical way and thereby unfairly neutralized a commercial advantage that the plaintiff achieved through 'honest labor.'"  *E.J. Brooks Co.*, 105 N.E.3d at 308 (alteration in original) (quoting *Int'l News Serv. v. Associated Press*, 248 U.S. 215, 236, 239–240 (1918)).  The theory "is 'broad and flexible,' [but] it is nevertheless limited to instances where a defendant took 'the skill, expenditures and labors' of plaintiff in bad faith and employed it for 'its own commercial advantage.'"  *Red Mountain Med. Holdings, Inc. v. Brill*, 563 F. Supp. 3d 159, 181 (S.D.N.Y. 2021) (quoting *Roy Exp. Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982)).

---

analysis and the most significant relationship test."  *Bode & Grenier, LLP v. Knight*, 808 F.3d 852, 864 (D.C. Cir. 2015) (internal quotation marks and citation omitted).  For the most significant relationship test: (1) the alleged injuries occurred in various parts of New York; (2) the relevant alleged conduct identified by Greyhound occurred in New York; (3) the plaintiff corporation is headquartered and incorporated in New York, although Greyhound is based in Texas; and (4) the relationship at issue is centered in the intercity busing market in New York.  For the governmental interest analysis, the relevant effects from Greyhound's counterclaims are all centered in the New York intercity busing market and therefore New York's policy would be most advanced compared to any other possible State.

The misappropriation theory broadly requires that (1) the defending party exploited the skill, expenditures, or labors of a competitor to neutralize a commercial advantage; (2) it did so in an unfair, or "inherently perfidious" manner; and (3) actual injury to the plaintiff resulted.  *See E.J. Brooks Co.*, 105 N.E.3d at 308 & n.5; *ITC Ltd.*, 880 N.E.2d at 858.   "[B]ad faith misappropriation of a commercial advantage belonging to another by exploitation of proprietary information" may satisfy these elements.  *Macy's Inc.*, 6 N.Y.S.3d at 13; *see, e.g.*, *Milton Abeles, Inc. v. Farmers Pride, Inc.*, 603 F. Supp. 2d 500, 503 (E.D.N.Y. 2009).

Greyhound posits two means by which Trailways misappropriated Greyhound's "skills expenditures and labors."  Greyhound's Opp'n 8–10.  Each fails.

For its first theory, Greyhound alleges that Trailways deceived Greyhound employees by stating that Trailways is "'looking into a way' to transfer seniority" for Greyhound drivers who switch to Trailways and falsely stating that Greyhound plans to close certain routes and locations.  *Id.*; Countercls. ¶¶ 8–14, 36.   Greyhound further alleges that Trailways approached those employees by "using the knowledge it has obtained about the location and employment terms for Greyhound's employees."  Countercls. ¶¶ 9, 36.[2]  These allegations and the accompanying factual matter do not plausibly state a claim for unfair competition.

For the content of the interactions, Greyhound has not plausibly alleged that Trailways's discussions were based on a bad faith exploitation of Greyhound's labor or information.  Quite the opposite.  Greyhound argues that Trailways *lied* to employees when discussing the future of Greyhound's services, and the possibility of seniority, rather than using any confidential or

---

[2] In its briefing, Greyhound argues more expansively that Trailways has "intimate knowledge of Greyhound's business practices through decades of pooling . . . unavailable to a stranger" and that exploitation of that information for competition on employees and customers constitutes unfair competition.  Greyhound's Opp'n 9–10 (internal quotation marks and citation omitted).  To the extent that the counterclaims do not contain factual matter supporting this assertion it will not be considered.  *See Williams v. Donovan*, 219 F. Supp. 3d 167, 177–78 (D.D.C. 2016); *see generally* Countercls. ¶¶ 35–38.

proprietary information gained from Greyhound.  Therefore, the content of the discussions with Greyhound employees do not serve as a basis for an unfair competition claim.

Greyhound also does not plead sufficient factual allegations to demonstrate that how those conversations came to be falls within the misappropriation framework.  That is, the counterclaims do not state that "knowledge . . . about the location and employment terms for Greyhound's employees," Countercls. ¶ 9, was misappropriated from Greyhound, nor allege that the information was confidential or proprietary.  *Contra Macy's Inc.*, 6 N.Y.S.3d at 13.  Furthermore, the counterclaims do not state factual matter supporting even an inference that the knowledge was obtained in a bad faith manner.  *See generally* Countercls. ¶¶ 35–38.  Without those kinds of factual allegations, Trailways cannot plausibly state a claim for relief under a theory of unfair competition. *See Red Mountain Med. Holdings*, 563 F. Supp. 3d at 177 n.11.  Its first theory accordingly fails.

Second, Greyhound alleges that Trailways "acted in bad faith by using its illegal holdover status in the Greyhound Albany Terminal to spread lies about Greyhound over the intercom and to specifically target Greyhound customers with discounts if they break their ticket with Greyhound."  Countercls. ¶ 36.  Those allegations do not plausibly allege exploitation and misappropriation constituting unfair competition.  Alleged lies and discount offers are not "instances where a defendant took 'the skill, expenditures and labors' of plaintiff in bad faith and employed it for 'its own commercial advantage.'"  *See Red Mountain Med. Holdings, Inc.*, 563 F. Supp. 3d at 181.  As for the holdover by Trailways, that circumstance presents as a rather standard landlord-tenant dispute.  At the time of the counterclaims, eviction proceedings had not yet been heard in Albany City Court.  Countercls. ¶ 18.  Holding over during the pendency of an eviction proceeding is not exploitation, nor is it "commercial immorality" of the kind that comprises an unfair competition claim.  *See Columbia Broad. Sys., Inc.*, 672 F.2d at 1105.  As alleged by

Greyhound, Trailways's actions do not constitute unfair competition and therefore Greyhound's second theory fails as well.

Greyhound includes in its briefing an additional allegation, appearing for the first time in its opposition to the motion to dismiss, that Trailways has essentially run roughshod over Greyhound's terminal, "block[ing] Greyhound's use of the loudspeaker so that Greyhound's customers will miss their connections" thereby "creat[ing] havoc and confusion . . . in Greyhound's Albany terminal." Greyhound's Opp'n 5 n.3, 8–9. A factual allegation appearing for the first time in briefing will not be considered. *See Williams*, 219 F. Supp. 3d at 177–78.[3]

Greyhound's counterclaims fail to state a claim to relief that is plausible on its face for unfair competition. Therefore, this Court will grant Trailways's motion to dismiss that count.

## B. Greyhound Does Not Plausibly State a Claim for Tortious Interference by Trailways

Greyhound asserts that Trailways has tortiously interfered with Greyhound's relations with two groups. Countercls. ¶¶ 26–34. First, Greyhound alleges that Trailways tortiously interfered with Greyhound's at-will employment relationship with its employees. *Id.* Second, it argues that Trailways did the same for Greyhound's contractual ticketing relationship with its customers. *Id.* Because Greyhound's counterclaims fail to state a claim to relief that is plausible on its face, it cannot maintain its tortious interference count with respect to either group.

The elements of tortious interference differ when interference is alleged involving a nonbinding contractual relationship, meaning a contractual relationship with "no legally

---

[3] In a footnote, Greyhound states that it "respectfully requests leave to file a motion to Supplement and/or Amend its Counterclaims to include this allegation and address any further allegations that the Court may deem insufficient." Greyhound's Opp'n 9 n.5. There is no motion on the docket making such a request, nor "an exhibit [containing] a copy of the proposed pleading as amended." Local Rule 15.1. The Court will not consider Greyhound's purported supplemental factual allegation under these circumstances. *Id.*; *see Belizan v. Hershon*, 434 F.3d 579, 580 (D.C. Cir. 2006) ("[A] request for leave must be submitted in the form of a written motion, as is made clear by the local rules of the district court."); Fed. R. Civ. P. 15(a).

enforceable right to performance," as opposed to a binding, that is enforceable, contractual relationship. *See Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 406 N.E.2d 445, 450 (N.Y. 1980).

For nonbinding contracts, including at-will employment relationships, courts require proof of highly culpable conduct. "[T]here is no liability in tort with respect to [interference with] an unenforceable contract—here a contract terminable at the will of either party—unless the means employed by defendant-competitor were wrongful." *NBT Bancorp Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 664 N.E.2d 492, 496 (N.Y. 1996); *see Lockheed Martin Corp. v. Aatlas Com. Inc.*, 725 N.Y.S.2d 722, 725 (N.Y. App. Div. 2001) ("Where . . . the allegations concern at-will employees not bound by covenants not to compete, plaintiff has the high burden of asserting that 'defendant employed wrongful means.'" (quoting *Murray v. SYSCO Corp.*, 710 N.Y.S.2d 179, 181 (N.Y. App. Div. 2000))). "[A]s a general rule, the defendant's conduct must amount to a crime or an independent tort." *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004). This may include "lur[ing] [third parties] by fraud or misrepresentation." *Id.* at 1104. Particularly when the contract in question involves at-will employment, "[c]ourts are disinclined to find tortious interference . . . unless a former employer can show that fraudulent or criminal activity was used in soliciting its employee." *Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 444 (E.D.N.Y. 2011).

When the general rule of criminal or tortious conduct is not satisfied, the party bringing the claim may still prevail by establishing that the defendant acted "for the sole purpose of inflicting intentional harm on plaintiffs" or possibly with "extreme and unfair economic pressure." *Carvel Corp.*, 818 N.E.2d at 1103, 1105 (internal quotation marks and citations omitted). The motive of "normal economic self-interest" is insufficiently culpable to satisfy this standard. *Id.* at 1103.

In sum, to establish tortious interference with a nonbinding contractual relationship, including an at-will employment relationship, Greyhound must sufficiently plead that (1) Greyhound had nonbinding contracts with third parties, or otherwise had a prospective business relationship with them; "(2) [Trailways], knowing of that relationship, intentionally interfere[d] with it; (3) [Trailways] act[ed] with the sole purpose of harming [Greyhound], or, failing that level of malice, use[d] dishonest, unfair, or improper means; and (4) the relationship [was] injured." *See Hadami, S.A. v. Xerox Corp.*, 272 F. Supp. 3d 587, 602 (S.D.N.Y. 2017) (quoting *Goldhirsh Grp., Inc. v. Alpert*, 107 F.3d 105, 108–09 (2d Cir. 1997)).

### 1. Greyhound Does Not Plausibly State a Claim for Tortious Interference with its At-Will Employment Relationships

Greyhound does not contest that it is alleging that Trailways interfered with at-will employment relationships. *See* Greyhound's Opp'n 6. It asserts that Trailway tortiously interfered with those nonbinding employment contracts "by making false promises to those employees," *id.* at 6–7, that "the way in which [Trailways] attempted to poach Greyhound's employees [] was wrongful, vindictive, and only for the purpose of harming Greyhound," *id.*, and that Trailways "scare[s] the Greyhound employees by lying to them about Greyhound . . . intend[ing] to close certain locations and end certain routes in upstate New York," Countercls. ¶ 10. Greyhound provides sufficient factual support for the first three elements of tortious interference, but ultimately insufficiently pleads the fourth element of tortious interference with a nonbinding contract: causation.

Greyhound's counterclaims state sufficient factual matter for the first two elements of tortious interference. For the first, Greyhound's counterclaims sufficiently plead an at-will employment relationship between Greyhound's employees and Greyhound. *See id.* at ¶ 27. They

also sufficiently state factual matter supporting the second element, that Trailways knew it was intentionally interfering with Greyhound's employment relationships. *Id.* at ¶¶ 8–14, 27–30.

Greyhound further pleads sufficient factual allegations to support the third element. In order to meet the third element, Greyhound needed to adequately allege that Trailways either (a) acted with the sole purpose of harming Greyhound, or (b) used sufficiently wrongful means. *See Carvel Corp.*, 818 N.E.2d at 1103–05; *Barbagallo*, 820 F. Supp. 2d at 444; *Hadami, S.A.*, 272 F. Supp. 3d at 602.

Greyhound undoubtably cannot rely on the intent to harm path because its counterclaims do not state any factual matter suggesting that Trailways's purpose was *solely* to harm Greyhound as opposed to just pursuing "normal economic self-interest," *Carvel Corp.*, 818 N.E.2d at 1103. *See generally* Countercls.   The closest Greyhound comes is its assertion that Trailways "approached the employees with the purpose of convincing them to leave Greyhound's employment to work for [Trailways] in order to harm Greyhound," Countercls. ¶ 29.   That is ultimately insufficient because it does not provide sufficient factual matter that Trailways's *sole* motivation was harm to Greyhound. *See Wade Park Land Holdings, LLC v. Kalikow*, 589 F. Supp. 3d 335, 389–90 (S.D.N.Y. 2022), *amended,* No. 21-cv-1657 (LJL), 2022 WL 2479110 (S.D.N.Y. July 6, 2022).

Greyhound succeeds in establishing the third element, however, based on wrongful means. Greyhound alleges that Trailways told Greyhound drivers "that because of the Pooling relationship, [Trailways] ha[s] a unique insight into Greyhound's business and operations" and falsely claimed that Greyhound "intends to close certain locations and end certain routes in upstate New York."   Countercls. ¶ 10.   Those allegations of "fraudulent" behavior, *Barbagallo*, 820 F. Supp. 2d at 444, could be sufficient to meet the level of "a crime or an independent tort . . . [such

as] fraud or misrepresentation." *Carvel Corp.*, 818 N.E.2d at 1103–05.  Trailways seeks to classify those alleged actions as "nothing more than predictions of future behavior."  Trailways's Reply 5. However, if Trailways's representatives (1) represented that they had inside knowledge about Greyhound's operations, (2) falsely claimed that Greyhound intended to close certain locations or routes, and (3) did so in order to induce Greyhound employees to leave Greyhound and join Trailways—such actions would move beyond mere persuasion and predictions and into the realm of wrongful means that may constitute tortious interference with nonbinding contracts.[4]

Nevertheless, Greyhound does not plead sufficient factual allegations for the fourth element: that Trailways's wrongful conduct caused the alleged injury to any contractual or business relationship between Greyhound and one of its employees.  *See Trepel v. Hodgins*, 121 N.Y.S.3d 605, 606 (N.Y. App. Div. 2020); *Total Asset Recovery Servs. v. Huddleston Cap. Partners VIII LLC*, No. 1:21-cv-2466 (ALC), 2022 WL 1052683, at *3 (S.D.N.Y. Apr. 4, 2022). In its counterclaims, Greyhound only states that "[s]ince the beginning of 2022, multiple employees have left Greyhound and are now employed by [Trailways]," Countercls. ¶ 13, and "employees that had been approached by [Trailways] quit working for Greyhound and started working for [Trailways]," Countercls. ¶ 30.  Such statements do not sufficiently plead that wrongful actions by Trailways caused interference with one of Greyhound's employment relationships or contracts.[5]  That failure leaves Greyhound without a claim to relief that is plausible

---

[4] It is also alleged that Trailways told Greyhound employees that Trailways was "'looking into a way' to transfer seniority."  Countercls. ¶ 11.  Such statements are plainly permissible persuasion and do not constitute any kind of "egregious conduct."  *See Carvel Corp.*, 818 N.E.2d at 1104.

[5] Indeed, while the Court does not rely on it, Greyhound's counterclaims actually suggest that Greyhound's employees may have left for alternative reasons divorced from any wrongful means employed by Trailways. *See, e.g.*, Countercls. ¶ 9 ("Greyhound employees are offered [by Trailways] substantial bonuses (in excess of $7,000) and other financial incentives, including a higher hourly wage for certain employees.").  This highlights Greyhound's failure to allege that the employees' departures are linked to Trailways's allegedly wrongful actions rather than permissible persuasion.

on its face under the theory of tortious interference with its employment contracts and relationships.

### 2. Greyhound Does Not Plausibly State a Claim for Tortious Interference with its Contractual Relationships with Greyhound Customers

Greyhound similarly fails to plausibly plead its allegations of tortious interference with customer contracts and relationships.  It points to its ticketing contracts, stating that it had a "valid contract with its customers that have purchased tickets for transportation on a Greyhound bus" and that Trailways intentionally interfered by "using its illegal holdover in the Albany Greyhound Terminal [and] spread[ing] falsities about Greyhound to Greyhound's customers and [] actively encourag[ing] Greyhound's customers to cancel their tickets with Greyhound."  Countercls. ¶¶ 31–32.

Greyhound does not state in its counterclaims whether these contracts were binding or nonbinding.  The closest it comes to answering the question is when it states that Trailways "actively encouraged Greyhound's customers to cancel their tickets with Greyhound" and "Greyhound was been [sic] damaged by such actions . . . which includes . . . the loss from customers that were encouraged by [Trailways] to cancel their Greyhound tickets."  Countercls. ¶¶ 32, 34.  Combined with its allegation that Trailways "falsely announce[d] that Greyhound does not offer refunds to customers" the counterclaims suggest that Greyhound's tickets were nonbinding.  *See* Countercls. ¶ 20.  This view is furthered by the parties' dispute about use of extrinsic evidence by Trailways to suggest that some Greyhound tickets were non-refundable— information that Greyhound wants excluded.  *See* Trailways's Mem. 5 & n.2; Greyhound's Opp'n 5 & n.3.

The Court need not resolve this issue, however, because Greyhound has failed to state a claim regardless of whether its contracts were binding or nonbinding.

If the contracts were binding, Greyhound has failed to allege the crucial required element that a customer breached his or her contract with Greyhound. *See Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375–76 (N.Y. 1996).[6]  Instead, Greyhound merely states that customers "cancel[ed]," *see* Countercls. ¶¶ 32, 34, but never provides factual matter explaining or demonstrating whether such a cancellation breached any contractual terms.  Thus, Greyhound cannot maintain a claim for interference with a binding contractual relationship.

If the contracts were nonbinding, Greyhound fails again on the fourth element of tortious interference with a nonbinding contract.[7]  Specifically, Greyhound fails to sufficiently plead a relationship between Trailways's alleged wrongful actions and Greyhound's injury.  Greyhound merely alleges that it has suffered injury from the "loss from customers that were encouraged by [Trailways] to cancel their Greyhound tickets." *Id.*  Greyhound does not plausibly allege that Trailways's possibly wrongful encouragement caused an individual customer to cancel his or her ticket—as opposed to permissible encouragement.  It merely alleges that some customers eventually canceled tickets after being encouraged to do so by Trailways.  Because Greyhound

---

[6] "[T]he elements of tortious interference with [a binding] contract are (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Restis v. Am. Coal. Against Nuclear Iran, Inc.*, 53 F. Supp. 3d 705, 727 (S.D.N.Y. 2014); *Lama Holding Co.*, 668 N.E.2d at 1375–76 (articulating those elements).  When these elements are met, even "lawful behavior" and deliberate indifference in causing a third party to breach a binding contract may constitute tortious interference. *Carvel Corp.*, 818 N.E.2d at 1103.

[7] On the third element, Greyhound does not plausibly plead that Trailways's sole purpose was to harm Greyhound, rather than a normal commercial interest in gaining additional customers. *See Carvel Corp.*, 818 N.E.2d at 1103; *see generally* Countercls. As for the wrongful means path, Greyhound alleges that Trailways "falsely announce[d] that Greyhound does not offer refunds to customers" and announced discounts for customers who canceled Greyhound tickets to purchase Trailways tickets. Countercls. ¶¶ 20–21. It also alleges that Trailways did so while being evicted from the location where it made the announcements. *Id.* at ¶ 21. The Court once again disregards new allegations, appearing for the first time in reply briefing, regarding blocked access to the intercom. *See supra* n. 3. The announcement of discounts is plainly permissible competition on price and not alone wrongful. *See Carvel Corp.*, 818 N.E.2d at 1104. However, the other factual matter actually in Greyhound's counterclaims presents a close question of whether, as a matter of law, Trailways is alleged to have taken sufficiently culpable actions rising to the level of wrongful means. However, given that Greyhound fails to adequately allege factual matter supporting the fourth element of the tort, this Court need not reach the question of whether the third element has indeed been satisfied.

does not allege adequate factual support to plausibly plead a connection between wrongful actions and a customer cancellation, Greyhound cannot maintain a theory of tortious interference with customer contracts and relationships. *See Trepel*, 121 N.Y.S.3d at 606; *Total Asset Recovery Servs.*, 2022 WL 1052683 at *3.

*     *     *

In sum, Greyhound has failed to state a claim to relief that is plausible on its face for tortious interference with binding or nonbinding contractual relationships.  Therefore, Trailways's motion to dismiss that count will be granted.

### C.  Greyhound's TRO Theory Survives

Greyhound seeks recovery for Trailways's unjust enrichment due to the Court's allegedly improper TRO and despite the absence of a TRO bond.  Countercls. ¶¶ 39–44.  Based on Greyhound's factual allegations and applicable law, Greyhound has stated a claim to relief that is plausible on its face.

"It is a well-settled rule that there can be no recovery for damages sustained by a wrongful issuance of a preliminary injunction in the absence of a bond unless the defendant sues for malicious prosecution or on a theory of unjust enrichment." *Buddy Sys., Inc. v. Exer-Genie, Inc.*, 545 F.2d 1164, 1167 (9th Cir. 1976) (internal citations omitted).[8]  Therefore, even when no bond has been required "plaintiff still may be liable for any unjust enrichment that has resulted during the period the injunction was in effect."  11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2973 (3d ed. April 2022 Westlaw Update)); *see also Ellipso, Inc. v. Mann*, No. 05-cv-1186 (RCL), 2008 WL 11492748, at *4 n.8 (D.D.C. Sept. 30, 2008) (explaining

---

[8] For purposes of considering liability for improper issuance, there is no difference between a preliminary injunction and a TRO.  *See* Fed. R. Civ. P. 65(c).

that "a theory of recovery based on unjust enrichment" permits recovery beyond the limitations of a bond (citing *Mitchell v. Riegel Textile, Inc.*, 259 F.2d 954, 955 (D.C. Cir. 1958))).

Generally, a Court must first determine whether a TRO was wrongfully issued before entertaining relief.  To do so, the Court does not merely look at the formalistic question of whether a TRO was vacated, as Trailways argues.  *See* Trailways's Reply 12.  Rather, a final judgment on the merits, or other final disposition, may reveal that a court was incorrect when it determined the legal rights justifying issuance of a TRO or preliminary injunction.  *See U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc.*, 775 F.3d 128, 138–39 (2d Cir. 2014).  Consequently, even though the TRO here was not vacated, further proceedings in this case could lead to a determination that there was no legal basis to require Greyhound to continue interlining with Trailways.  In such a circumstance, Greyhound may be entitled to an equitable remedy, as established through the law of unjust enrichment.  At the motion to dismiss stage, Greyhound will be permitted to assume that the TRO issued by this Court was indeed improper.  *See* Countercls. ¶ 41.

Next, the Court must consider whether there was an injunction bond and, if there was not, determine whether the defendant is pursuing a permissible theory of recovery.  Here, this Court exercised its discretion to set a zero-dollar bond value when issuing the TRO, therefore leaving Greyhound no bond to pursue.  ECF No. 9.  Without a bond, Greyhound must plead a theory of unjust enrichment, or malicious prosecution.  It has chosen the former and incorporated the theory into its counterclaims.  *See Countercls.* ¶¶ 39–44.

Finally, the Court must consider whether the defendant has sufficiently pleaded the elements of its permissible theory of recovery.  Accordingly, the Court will now consider the elements of unjust enrichment and their application to this situation.

"[U]njust enrichment lies as a quasi-contract claim and contemplates an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties." *Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012) (internal quotation marks and citation omitted).  To establish unjust enrichment, "[a] plaintiff must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011) (second alteration in original) (internal quotation marks and citations omitted).  As a further requirement, unjust enrichment will not lie "unless [the plaintiff] has a sufficiently close relationship with the other party." *Georgia Malone & Co.*, 973 N.E.2d at 746.  This requires the existence of "a relationship or connection between the parties that is not too attenuated." *Id.* (internal quotation marks omitted).

At its core, unjust enrichment is an equitable doctrine that "depends upon broad considerations of equity and justice." *Columbia Mem'l Hosp. v. Hinds*, 192 N.E.3d 1128, 1137 (N.Y. 2022) (internal quotation marks and citation omitted).  "The essential inquiry in any action for unjust enrichment is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." *Mandarin Trading Ltd.*, 944 N.E.2d at 1110 (alteration removed) (internal citation omitted).  Greyhound has sufficiently pleaded unjust enrichment and restitution based on unjust enrichment.

The first two elements are sufficiently satisfied at this stage.  This Court ordered that Greyhound "shall continue interlining" with Trailways.  ECF No. 9; *see* Countercls. ¶ 22. Assuming Greyhound was not contractually obligated to continue interlining, Trailways was enriched with the benefit of interlining at the expense of Greyhound, which was made to provide that service for free without having a contractual obligation to do so.  Furthermore, there is no

legitimate dispute regarding the parties' relationship being too attenuated, as it might be in the case of nonparties to a transaction being haled into court. *See, e.g.*, *Mandarin Trading Ltd.*, 944 N.E.2d at 1111. Here, Trailways and Greyhound had a longstanding prior relationship, and Trailways sued in this Court asking for a TRO to maintain that relationship.

For the third factor, "to determine if it is against equity to permit a party to retain what is sought to be recovered," a court should "look to see if" (1) "a benefit has been conferred on the defendant under mistake of fact or law"; (2) "if the benefit still remains with the defendant"; (3) "if there has been otherwise a change of position by the defendant"; and (4) "whether the defendant's conduct was tortious or fraudulent." *Columbia Mem'l Hosp.*, 192 N.E.3d at 1137 (internal quotation marks omitted). Here, the counterclaims plead sufficient factual matter to plausibly satisfy these equitable principles. If later proceedings reveal that the TRO was wrongfully issued, Greyhound would have been made to confer the benefit of continued interlining based on a mistake of law; Trailways would have retained the benefit of that cost-free time period of interlining; and the counterclaims do not suggest any countervailing change in position. While it is true that Trailways's conduct in seeking the TRO does not plausibly appear to be tortious or fraudulent, equitable principles nevertheless could recognize Greyhound's unjust-enrichment claim were Greyhound to succeed in demonstrating that the TRO was wrongfully issued and Trailways unjustly retained a benefit. *See Latipac Corp. v. BMH Realty LLC*, 938 N.Y.S.2d 30, 41 (N.Y. App. Div. 2012) (authorizing restitution for an erroneously issued injunction).

Trailways argues that unjust enrichment and restitution for a wrongfully issued TRO or injunction must be limited to situations where an "identifiable sums or specific property [were] transferred pursuant to a court order." *See* Trailways's Reply 11. Trailways is correct to an extent. It is true that the typical situations where an unjust enrichment theory is permitted—in the context

of improper issuance of an injunction or TRO—involve identifiable sums or property.  *See* Restatement (First) of Restitution § 74 (Westlaw October 2022 Update).  But when, as here, one party was made to provide an identifiable service to the other party, unjust enrichment may allow for recovery of the value of that service just like other identifiable benefits unjustly conferred and retained.  *See Latipac Corp.*, 938 N.Y.S.2d at 41.  "It simply is not a principle of restitution that it is available only when the sums are indisputable. For example, almost any restitution for performance of services, will require calculation of the reasonable value of the services. . . . [Including] benefits conferred under a judgment."  *Nat'l Kidney Patients Ass'n v. Sullivan*, 958 F.2d 1127, 1136 (D.C. Cir. 1992) (internal citation omitted) (considering restitution for a wrongfully issued injunction); *cf. Littell v. Morton*, 369 F. Supp. 411, 420 (D. Md. 1974) ("[I]t would now be inequitable to allow the [party] to have received these services free."), *aff'd,* 519 F.2d 1399 (4th Cir. 1975).[9]  Requiring a party to remit the value of a service improperly received is little different than requiring a wrongfully paid fee to be redressed, or improperly transferred property restored to its original owner.  Such restitution falls squarely within a proper exercise of this Court's equitable discretion in the context of a wrongfully issued TRO or injunction.

Here, Greyhound continued interlining with Trailways during the pendency of the TRO issued by this Court.  If Greyhound was ultimately never under any contractual obligation to continue interlining, the principles of unjust enrichment may require payment for that freely provided service.  *See Mandarin Trading Ltd.*, 944 N.E.2d at 1110.  Alternative measures of damage may be considered if Greyhound indeed prevails later in this litigation, so long as they are

---

[9] *See also* Ofer Grosskopf & Barak Medina, *Remedies for Wrongfully-Issued Preliminary Injunctions: The Case for Disgorgement of Profits*, 32 Seattle U. L. Rev. 903, 912 & n.40 (2009) ("The only exceptions we are familiar with are cases in which the preliminary injunction allowed the plaintiff to keep the defendant's property *or required the defendant to continue to provide a service for the plaintiff*." (emphasis added)).

consistent with the larger principles of unjust enrichment and equity. Until that time, the relevant portion of Greyhound's counterclaims shall survive Trailways's motion to dismiss.

*       *       *

At this early stage, the Court concludes that Greyhound could possibly recover on the grounds of unjust enrichment and restitution if further proceedings demonstrate that the Court's TRO was impropriety issued on the merits. Should such a time arise, this Court will exercise its equitable discretion to determine whether recovery on those grounds is proper and, if so, the extent of permissible recovery. Therefore, Trailways's motion to dismiss will be denied as to those counts.

## IV.    CONCLUSION

Based on the reasoning above, the Court will **GRANT IN PART AND DENY IN PART** Trailways's motion to dismiss. A separate order consistent with this memorandum opinion shall issue this date.

Date: January 17, 2023

Royce C. Lamberth
United States District Judge